THE PEOPLE, *ex rel.* John A. Barry, *vs.* THOMAS R. MERCEIN.

Upon the return to a habeas corpus, directed to the father-in-law of the relator, requiring him to bring before the court the wife and infant child of the relator, alleged to be detained from him by the defendant, the wife is a competent witness for the defendant to prove acts of cruelty committed by her husband on her, which justified her separation from him and her refusal to return to his house; but she cannot testify as to his general character, or as to any misconduct of his in other respects.

The general rule is, that a wife cannot be admitted as a witness for or against her husband, either in civil or criminal proceedings. But to this rule there are exceptions in cases where the wife is the injured person, complaining of cruel treatment by her husband, and where the form of the proceeding is not such as to exclude her upon the technical ground that she is a party to the suit.

Where a wife voluntarily absents herself from her husband, either with or without justifiable cause, no court in this state has any jurisdiction or authority, upon habeas corpus or otherwise, to compel her to return to the bed and board of her husband, and to the performance of her conjugal duties. But if a third party violates the rights of the husband in such a case, by harboring the wife who separates herself from him without sufficient cause, he has a remedy against such party at the common law, by an action on the case for damages.

Where a child, in consequence of its tender years, is incapable of exercising any volition as to its future residence, the court before whom it is brought upon a habeas corpus will decide that question for such child; and will in that decision have regard not only to the immediate safety, but also to the future welfare of the child.

It seems, that the power of the chancellor to issue a habeas corpus to inquire into the cause of detention, does not depend solely upon the revised statutes, but is an inherent power in the court of chancery derived from the common law, but which power is to be exercised in conformity to the provisions of the revised statutes on the subject.

The right to the guardianship of an infant cannot be tried upon a habeas corpus. And the court of chancery, upon such writ, will exercise its discretion, in disposing of the custody of the infant, upon the same principles

1839.

The People
v.
Mercein.

which regulate the exercise of a similar discretion by other courts and officers who are authorized to allow the writ in similar cases.

In the exercise of this discretion, the natural rights of parents to the custody of their infant children are not to be disregarded. And where parents are living in a state of separation, either with or without a legal decree authorizing a suspension of matrimonial cohabitation, a summary inquiry as to the relative merits or demerits of each may be necessary, to enable the court to make a proper disposition of their infant children brought up on habeas corpus.

Where the wife is not living in a state of separation from her husband which can be considered as illegal and immoral, the custody of an infant of tender age will be given to the mother, wherever it appears that the interest of the infant demands it; so *held* in the case of an infant who was but twenty-one months old.

Where no sufficient reasons exist for depriving the mother of the care and nurture of her infant child of very tender years, it would not be a proper exercise of judicial discretion, to take the child from the custody of the mother for the purpose of delivering it to the father.

August 10.

THIS case came before the court upon the return of a writ of *habeas corpus ad subjiciendum* directed to the defendant, the father-in-law of the relator, commanding him to bring before the court the wife and the infant child of the relator, alleged to be detained from him by the defendant. In the return to the writ, the defendant admitted he was harboring and protecting the wife and child of the relator, and that the child was in his power and under his control, so far that he refused to permit it to be taken from his house by the relator without the consent of the wife, who was perfectly at liberty to return to her husband or to remain under the protection of the defendant's roof, as she thought fit. The return stated various facts as reasons why the wife refused to return to the bed and board of her husband, and to show that it would be improper and inexpedient to permit the child to be taken from its mother, if she had justifiable cause for refusing to return to his residence.

The defendant, among other things, stated as justifiable causes of separation on the part of the wife, that he was informed and believed the husband had been guilty of various acts of misconduct toward his wife, and otherwise, detailed by her in a sworn statement annexed to the defendant's return to the writ; which statement was in the form of a re-

turn to the writ made by her. To prove the truth of the allegations in his return, the defendant asked to be permitted to read this sworn statement of the wife ; and if that was deemed inadmissible, then that he might be permitted to examine the wife as a witness to establish the same facts.

*N. Hill, jun. & S. J. Cowen*, for the relator.

*G. Griffin & J. W. Gerard*, for the defendant.

THE CHANCELLOR. As the habeas corpus in this case was directed to the father-in-law, commanding him to bring up both the wife and child, and was served by the relator on him only, it is perfectly clear that it is not a case contemplated by the legislature, in the provision of the revised statutes which makes it the duty of the person upon whom the writ is served to return the same, even if not named therein, so as to authorize the wife to make a return to the writ ; although the defendant may have delivered the writ to her after it had been served on himself. Her sworn statement in the form of a return, therefore, cannot be deemed a proper return of the wife to the writ, so as to require the relator to disapprove that statement as her return under oath. And as she is present, and can be examined openly in the presence of the relator and his counsel, if she is a competent witness against the husband for any purpose in this matter, her ex parte statement on oath cannot be read or used as evidence, should they insist upon an open examination on oath, with the right of cross-examination on the part of the relator. It is insisted, however, by the counsel for the husband, that she is an incompetent witness against him to prove any of the facts contained in her statement which is made a part of the defendant's return. And this is a question which, so far as I have been able to discover during the short time I have been allowed to examine the same, has never been distinctly decided by any court, either in this country or in England.

The general rule that a wife cannot be admitted as a

1839.

The People
v.
Mercein.

witness for or against her husband, either in criminal or civil proceedings, is well settled in that country from which the common law of this state is derived, and such is unquestionably the general rule of law here. The rule is founded upon a principle of public policy, which forbids that the peace and happiness of the married relation should be disturbed by arraying the wife against her husband as a witness, where his interest is concerned as a party in opposition to her testimony; or that she should be tempted to pervert the truth by being called as a witness in his favor, where the intimate relation which does or should always subsist between them renders her interests and his nearly identical. She is also prohibited from being a witness against him, upon the principle that the happiness of the married relation requires that perfect confidence should subsist between the husband and wife; so that he may freely communicate with her in relation to his business, and to all the various transactions of his life, in the full assurance that she can never afterward be compelled or even permitted to give evidence against him to his injury as to any matters thus communicated. And so sacred is this principle held, that in the case of *Monro* v. *Twistleton*, (*Norris' Peake, App.* 24,) Lord Alvanley declared that a witness should not be permitted to give evidence against her former husband as to any thing which occurred during the existence of the marriage relation, although she had been divorced by act of parliament before she was examined as a witness.

It is admitted, however, that there are exceptions to this general rule, in cases where the wife herself is the injured person, and where the form of the proceedings is such that she is not excluded upon the technical objection that she is party to the suit. By the law of Scotland, as was decided in the case of *Crommelin*, for an assault on his wife, (*Swinton's Just. Rep.* 291,) the wife is compelled to testify against the husband in such cases, and she has not the option to give evidence or not. In the case of Mysie Graham, who was indicted for an attempt to murder her hus-

band, by hanging him while he was asleep, in which attempt she well nigh succeeded, the husband was called as a witness against her, although he said he would be willing to take her home again, if she was liberated. (*Symes'* *Just. Rep.* 152.) Nor are these exceptions limited to cases where the injury to the wife is committed when no persons are present, but herself, who are competent witnesses. For upon the trial of Earl of Castlehaven, for an outrage upon his wife, generally known as 'Lord Audley's case,' his Countess was permitted to give evidence against him, although his servant Brodway, the instrument of the outrage, was examined as a witness in behalf of the crown, and testified to the same facts. In the ordinary case also of an indictment of the husband for an assault upon the wife, I believe the question is never asked whether any other person was present at the time of the assault who is competent to give evidence, for the purpose of ascertaining whether the wife can be examined as a witness to prove the abuse by the husband. In all cases coming within the exceptions to the general rule, the evidence of the wife is received upon the supposition that her testimony may be necessary, in addition to the other evidence produced, to establish the fact, of the alleged injury or abuse of herself personally, to the satisfaction of the court or jury on the hearing of the case.

The question now under consideration, arose in the case of *De Manville* v. *De Manville*, (10 *Vesey*, 52,) substantially as in this case. For although that was not a proceeding on a habeas corpus, it was a petition presented by the wife and child, in a suit in chancery instituted in the name of the child ; which gave the court jurisdiction over the husband as a party, the child being thereby constituted a ward of the court. And the object of the application there was to give the custody of the child to the wife, who was living in a state of separation from her husband without his consent, on the ground, as the petitioner alleged, of his cruel treatment. But although Lord Eldon seemed to express an opinion in favor of receiving the affidavit of the

wife against her husband, it appears by the report that the affidavit was only read de bene esse. And upon the final decision on the petition, his lordship expressly stated that he did not mean to decide the question whether he was at liberty to pay any attention to the wife's affidavit ; the application being disposed of by him on other grounds.

The affidavit of the wife was also received by Mr. Justice Bronson, de bene esse, in the case of *The People* v. *Chegaray*, (18 *Wendell*, 637,) where she was the relator in an application for a habeas corpus to obtain the custody of the children. But the judge decided the case against her, without passing upon the question of the admissibility of her evidence against the defendant. It may, however, be remarked in relation to that case, that the husband was not a nominal party to the proceedings ; the habeas corpus being directed to other persons, with whom the children had been placed by the father. And his affidavit appears to have been read as evidence against his wife, the relator, without objection.

This question therefore being still unsettled by any judicial decision, it remains for me to determine whether the present case comes within the spirit of the exceptions to what is admitted by the counsel for both parties to be the general rule of law. The exceptions to that rule do not always proceed upon the ground that the wife has a direct personal interest in the question as to which she is called upon to give evidence. Indeed, with the exception of the single case of her applying for surety of the peace against her husband, it can hardly be said she had a personal interest in the decision of the suit against him in those cases where she has been permitted to give evidence. She is permitted to be a witness in most of the cases excepted from the general rule, from principles of public policy, in order that he may be restrained from committing outrages against her, in the retirement of the family circle, under the supposition that he may do so with impunity. Whenever, therefore, the policy or necessity of admitting her as a witness against her husband is sufficiently strong to over-

balance the principle of public policy upon which the general rule of exclusion is based, she ought to be received as a witness, if she has no personal interest adverse to his which would of itself form a ground for her exclusion.

In the present case the husband is seeking to deprive his infant child of the care and protection of a mother, upon the ground that the mother has improperly and unjustifiably withdrawn herself from his bed and board, in violation of her marriage vows. And if such is the real fact, however I may doubt the wisdom of the course he is pursuing, to induce her to return to her duty as a christian wife and mother, I am not prepared to say he can be deprived of the society of his child, as well as of his wife, unless the safety of the child itself requires him to refrain for a time from exercising his parental rights. But on the other hand, if his misconduct toward the partner of his bed and his bosom has furnished her with good cause for seeking again the protection of the paternal roof, no law, either human or divine, requires me to remove this infant from her arms, or from the same friendly shelter. The same necessity and policy, therefore, which allow the wife to be a witness against her husband upon an indictment, to prove similar acts of oppression and cruelty toward her, seem to indicate that she should be permitted to prove any acts of cruelty, if such exist, which will justify her refusal to return to the house of her husband. She must therefore be permitted to testify to any such acts of cruelty stated in the return or the documents annexed to it. But she cannot be allowed to appear as a witness against him as to his general character, or as to any misconduct of his in other respects.

The evidence having been taken in the cause in reference to the various matters stated in the petition upon which the habeas corpus was granted, and in the return of the defendant Mercein, the case was fully argued before the chancellor, and he thereupon delivered the following opinion upon the various questions of law and fact which arose therein.

August 26.

THE CHANCELLOR. The object of the habeas corpus in this case is to enable the relator to obtain the custody of his wife and of his infant child, now twenty-one months of age, both of whom, as alleged in the petition, are illegally restrained and kept from him, in violation of his marital and paternal rights, by T. R. Mercein, the father of his wife. So far as relates to the wife, the return of the defendant states that she is under no restraint whatever ; but on the contrary, that she is now, and at all times has been, at perfect liberty to go whithersoever she pleased. No attempt has been made on the part of the relator to contradict this part of the return. I am also satisfied, by a private examination of the lady herself, that no coercion whatever has been used on the part of her father, or of any of her friends, to induce her to remain under the paternal roof.

If she remains separated from her husband, therefore, in violation of her marriage vows, and of her duty as a wife, it is her own voluntary act. And as neither this court nor any other court in this state, has any jurisdiction or authority, upon habeas corpus or otherwise, to compel a wife to return to the bed and board of her husband and to the performance of her conjugal duties, where she voluntarily absents herself from him, either with or without justifiable cause, it only remains for me to decree and declare as to her, that she is under no restraint whatever. She is therefore at perfect liberty, so far as the power of this court is concerned, to return to her husband, or to seek the protection of her father's house, or the protection of any other relative or friend who may think proper to assume the legal responsibility of affording her a shelter in opposition to what the relator claims to be his marital rights. If any third party violates the rights of the husband in this respect, by harboring a wife who separates herself from him without any sufficient cause, the common law has provided him a remedy against such person, by an action on the case for damages. But so far as regards the wife herself, the laws of this state, whether wisely or unwisely it is not

1839.

The People
v.
Mercein.

for me to say, have left her only responsible to her own conscience and to her God, for such a violation of her conjugal duties. I will therefore only say here, as I have before said, upon another occasion, that a christian wife and mother should suffer long and much before she can be justified in resorting to the doubtful and dangerous expedient of separating herself permanently from him whom she has once chosen for the partner of her bed and bosom, thereby placing both herself and him in the " undefined and dangerous situations of a husband without a wife, and a wife without a husband."

The decision of the case, so far as respects the infant daughter of the relator, depends upon different principles ; as from her tender years she is wholly incapable, at this time, of exercising any volition whatever in regard to her future residence. The court therefore must, for the present, decide that question for her, with reference not only to her own immediate safety, but also with a due regard for her future welfare. In such a case as this, it is not material, perhaps, to inquire whether the chancellor, in allowing the writ of habeas corpus, acts as a mere commissioner under the statute, or as a court proceeding by virtue of an inherent power derived from the common law, but regulated in the exercise of that power by the special provisions of the revised statutes on the subject. Were it necessary, however, I think there would be no difficulty in showing that the power of the chancellor to issue a habeas corpus is not derived solely from the statute, but is also an inherent power in the court, derived from the common law ; although the authority of this court, as well as of the supreme court, to award the writ, and to proceed thereon, is to be exercised in conformity to the several provisions of the revised statutes. (2 *R. S.* 573, § 73.) A writ of habeas corpus ad subjiciendum, however, is not, either by the common law or under the provisions of the revised statutes, the proper mode of instituting a proceeding to try the legal right of a party to the guardianship of an infant. This court, therefore, upon such a writ, will exer-

cise its discretion in disposing of the custody of the infant, upon the same principles which regulate the exercise of a similar discretion by other courts and officers who are authorized to allow the writ in similar cases. And such was the decision of Chancellor Kent in the case of *Wollstonecraft*, (4 *John. Ch. Rep.* 80,) referred to by the counsel on the argument. In the exercise of such a discretion, however, the natural rights of parents to the custody of their infant children are not wholly to be lost sight of, by the court or officer before whom the writ is returnable. And where, as in this case, it unfortunately happens that the parents are living separate from each other, either with or without a legal decree authorizing a suspension of matrimonial cohabitation, a summary inquiry as to the relative merits or demerits of each may frequently become necessary, to enable the court to make a proper disposition of their infant children who are brought up on habeas corpus. For this reason it was that the relator and the defendant, in the present case, were permitted to occupy the court for so many days in the investigation of the causes which have led to the separation between the relator and his wife; which causes the defendant insists are sufficient to justify the wife in her refusal to return to matrimonial cohabitation, and to authorize him, by the laws of this state, to give to her and to her infant daughter shelter and protection.

But before I proceed to state the conclusion at which my own mind has arrived on that subject, it may be proper to state that it is contrary to public policy to allow the husband or the wife to withdraw from the duty of matrimonial cohabitation for any slight causes, which do not endanger the personal safety of the party; as such withdrawal is wholly repugnant to good morals and to the injunctions of the divine lawgiver. The court, therefore, is bound to set its face against every attempt on the part of married persons, either by agreement or otherwise, to throw off the duties or the responsibilities which the marriage contract has imposed upon them. To use the language of a late distinguished judge, who certainly was well qualified to speak on this

subject, and from experience too if his biographer is correct in supposing that his own matrimonial sky was not always clear, it is not difficult to show that the law in this respect is in accordance with its usual wisdom and humanity; with that true wisdom and real humanity which regard the general interests of mankind. Though in particular cases the repugnance of the law to dissolve the obligations of matrimonial cohabitation may operate with great severity upon individuals, yet it must be remembered that the general happiness of the married life is secured by its indissolubility. When married people understand that they must live together, except for a very few reasons known to the law, they have to soften by mutual accommodation that yoke which they know they cannot shake off. They become good husbands and good wives from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties it imposes. Were it once understood that upon mutual disgust married persons might legally separate themselves from each other, many couples, who now pass through the world with mutual comfort, with attention to their common offspring and to the moral order of civil society, might have been at this moment living in a state of mutual unkindness; in a state of estrangement from their common offspring; and perhaps in a state of the most licentious and unreserved immorality. In this case, as in many others, therefore, the happiness of some individuals must be sacrificed to the greater and more general good. (*See Evans* v. *Evans*, 1 *Hagg. Consist. Rep.* 36.)

The relator and his wife were married in the spring of 1835; he then being a widow with five children, the two youngest of whom were about ten years of age, and she having arrived at the mature age of twenty-five or six. The husband residing at Liverpool, in Nova Scotia, and his intended wife at New-York, it was made a condition of her consent to the marriage, and upon which condition also the consent of her parents was obtained, that at the expiration of one year from the time of the marriage he should close

*margin note:*
1839.

The People
v.
Mercein.

his business at his then place of residence, and return with his wife to New-York, to live for the future. This agreement, although it is not such a one as could be legally enforced, is important to be kept in view, as I think it has been one of the principal causes which, it is much to be feared, have forever destroyed the domestic peace and happiness of these parties. That Mrs. Barry's attachment to her parental home was uncommonly strong, and perhaps so much so as almost to amount to a mental disease, I think is fully established by the proofs, and by her correspondence both before and after the marriage. And that fact alone is sufficient to satisfy me that the relator either greatly erred in entering into such an agreement originally, or in afterwards urging her to return and reside with him in Nova Scotia; or at least in attempting to coerce such return by taking her children from her, while such uncontrollable attachment to the home of her youth continued in its undiminished strength.

That she once loved her husband also, as few have ever loved before, I think no one who reads the correspondence in this case can for a moment doubt. It is equally evident, to my mind, that the relator loved his wife with a strength of attachment which was not inferior to hers; although he has at times, under the influence of passion, aggravated probably by the situation of his pecuniary affairs, indulged himself in conduct toward her which certainly appears like great injustice; especially since the commencement of his commercial difficulties after his removal to New-York. The sister testifies that during the first six months after the marriage, while she was with them at Liverpool, she saw, as she supposed, an occasional harshness of expression on the part of Mr. Barry; and that his wife was frequently low spirited and in tears. And Miss Mercein very naturally was led to suspect that this depression of spirits, &c. in her sister, arose from dissatisfaction with the conduct of her husband toward her. There was nothing, however, in the appearances testified to by this witness, which cannot reasonably be accounted for

from the established fact of her strong attachment to the home of her childhood, and to her absent parents ; she being at that time in a land of strangers, or where she had comparatively few acquaintances. If these parties entered into the marriage contract with the extravagant expectation that all were to be halcyon days, " the husband supposing that all was to be authority with him, and the wife that all was to be accommodation to her," there can be no reason to doubt that both were soon disappointed, and were led to the irresistible conclusion that there is no perfection short of Heaven. But that the relator had done nothing before Miss Mercein left Liverpool to diminish in any degree the strong affection his wife once had for him, is placed beyond all question by the perusal of her letters to him down to that period, and especially the letters to her husband and to Miss Imogene Mercein, a few days after that sister left her to return to New-York.

To show that I cannot be mistaken on this subject, unless Mrs. Barry penned a deliberate falsehood, which I am sure she is incapable of doing, it is only necessary to refer to the extract from her letter to the sister, written four days after that sister left for New-York. That extract is contained in a letter to the relator, who was then at Halifax, couched in terms of the most devoted tenderness and affection, and is as follows : " And now, dear Imogene, for your own letter. If the weight of anxiety and fear you feel would vanish by my calm written assurance that I am happy, let it be entirely dispelled. I might be silent were it otherwise, but for worlds I would not dare in so many words to deceive you. Apart from my present and anticipated separation from home, I would not exchange my lot with mortal. There are few such hearts as Barry's, and his, I feel, is truly and wholly mine. My love for him is not only warm, it is deep, intense ; and though it has not entirely conquered the pride and selfishness fostered for nearly thirty years, it will certainly triumph. I know it has not appeared to you as deep as it really is, but remember it has been most severely tried. I attempt no apology for my waywardness—it deserves none. But you know

my family affection is uncommonly strong, and the thought of a final separation has *embittered my married life.* Even now, for his dear sake, I can resign, without a sigh, things I once thought impossible—station, influence, and other adventitious circumstances—they are as the dust of the balance compared to him." After a most affecting allusion to the strength of her filial affection, which continued to " distract her mind and agonize her heart," and the horror of the thought of being sick among strangers, she thus concludes this part of her letter : " But to return ; I earnestly implore you not to let the shadow of blame, the slightest imputation even of rashness, rest upon dear Barry. One word to that effect and I shall find alienation from home no hard trial, and would cling to him at the expense of every thing and every one I have ever loved. Tell my parents that he is my earthly all—deservedly my heart's elected."

This is not the language of waning affection, or of a heart which already begins to feel that it has been deceived in its fondest anticipations. No ; it is the strong and convincing language of nature and of truth—the natural language of a heart which must have been perfectly satisfied, and have most deeply felt, that its best affections had not been fixed upon an unworthy object—a capricious and tyrannical husband, wholly incapable of appreciating, as well as of returning, the love of an amiable and devoted wife. No subsequent events, therefore, can satisfy me that he at that time deserved the character which has been attributed to him by the counsel of the defendant. That he was a man of a hasty temper, is admitted by his counsel, and it is also established by the evidence in the case. But that would not necessarily render him a less kind and affectionate husband, though it naturally required more prudence and circumspection on the part of the wife.

The first occurrence which deserves any notice, after Miss Mercein left Liverpool, is the difficulty in relation to the taking of the medicine, in the latter part of January or the beginning of February, 1836. There is no reason to doubt that Mrs. Barry really supposed the conduct of her

husband on that occasion was very harsh and unkind; and that it arose from an unworthy desire to enforce implicit obedience to an unreasonable command, with the view of triumphing over her. Taking, however, her own statement of the affair, in connection with his sworn explanation and the evidence of other witnesses, I am satisfied she is laboring under an entire mistake as to the real motive of his apparent unkindness on that occasion. Mrs. B. had inadvertently swallowed a peach pit, which, as the husband believed, actually endangered her life; though it is pretty evident, from all the circumstances, she did not think her life was in such imminent danger as he believed it to be after he had privately consulted with a physician. The physician was finally called in, and prescribed cream of tartar and sulphur mixed with honey, as the husband swears in his petition; though she understood the prescription to be cream of tartar *or* sulphur. She therefore remonstrated against taking the medicine which the husband had procured from the shop of the physician, on the ground that she had a strong and uncontrolable aversion to sulphur. The husband undoubtedly supposed this to be a mere whim; and believing her safety required that the unpalatable dose should be taken, and should be continued from time to time until she obtained relief, urged the medicine strenuously upon her. The feelings of both at length became too much excited, and it finally resulted in his indiscreetly declaring that she *should* take the medicine, and in her equally positive refusal to do so. This fatal issue having been formed, it necessarily became a matter of much feeling on the part of both, and perhaps a matter of principle on the part of one of them, as to which should give way. For the husband does not appear then to have learned that the relinquishment of his legal right to enforce obedience, on the part of a most devoted and affectionate wife, could not have detracted in the least from his true dignity, under the circumstances in which she was placed, even if he was fully satisfied that her refusal was the result of mere caprice. He did not, however, resort to any harsh measures to com-

1839.

The People
v.
Mercein.

pel her to give way and take the medicine. But he made another indiscreet declaration, which I think his subsequent conduct shows he soon heartily repented of, that he would leave her room and not return to it again until she complied with his wishes. He accordingly left her and lay that night upon the sofa in another room, to the manifest danger of his own health; for she says " it was bitter cold weather." And he continued to absent himself from her until the afternoon of the next day, when she made up her mind to submit and take the medicine; upon which he immediately took her in his arms and kissed her, said she was a good girl, and carried her to her room. That she had yet to learn " that the true dignity of a wife cannot be violated by submission to her husband," is evident however from the fact, that at the very moment of that submission, she accompanied it with the indiscreet declaration that his and her happiness was at an end forever; and that too in the presence of Dolly, the servant. Although the husband at the time was so happy to be relieved from the unpleasant situation in which he had placed himself, by his rash threat, as not to notice this declaration of the wife, it was unquestionably remembered by both. And I fear that it was not without its influence in producing or in aggravating some of the difficulties which occurred between the parties after they left Nova Scotia and removed to New-York, in May, 1836, in pursuance of the ante-nuptial agreement. I do not think, however, that any thing occurred before the removal to New-York which ought to have produced any alienation of the affections of either; certainly nothing which could excuse either even for a serious thought of discontinuing matrimonial intercourse.

After their removal to New-York, two difficulties occurred, in which, according to the statement of Mrs. Barry, the husband was clearly wrong. The first occurred in November, 1836, about a fortnight after the birth of her first child; when her nurse had left her, and when the mother, who was to have supplied the place of the nurse for a few days, had been called home to attend the sick

bed of Miss Imogene Mercein. The relator had promised that himself and his daughter should supply the place of a nurse to his wife who had not yet left her room, though she was able to sit up. Under those circumstances, no provocation, however great, could justify him in treating her with unkindness, much less in leaving her alone with her infant all night, even if she unreasonably declined the assistance of his daughter whom he had called and sent to her room. The alleged fault of his wife—if fault it was to have bought a cot of the value of two dollars for the use of her nurse—could not reasonably have excited the angry feelings which he exhibted at such a time. There must therefore have been some other cause of offence, either real or imaginary, to have produced this rupture between the husband and the wife, or his conduct was not only very unfeeling but is wholly inexplicable. I think Mrs. Barry is under a mistake in supposing that he overheard the conversation between her and Celia, and that he must therefore have known she was entirely alone with her infant child. The circumstances detailed by her have led my mind to a different conclusion. Still, however, I must be permitted to say, his conduct on that occasion, whatever extenuating facts may have existed which are not disclosed, was wholly inexcusable.

The second difficulty occurred in April or May, 1837, when the servant gave notice she was going to leave them. Mrs. Barry admits that they had sometimes differed in opinion as to the merits of Dolly; the husband maintaining the position that this black girl was the best servant that ever lived, and the wife insisting that Dolly was a pretty good servant, but not the best. From the testimony of Mrs. Barry, I am satisfied that a violent quarrel took place between the parties; and if she recollects the circumstances correctly, the fault of beginning it without cause rests wholly with him. In this I have reason to believe she is probably right. Dolly was called as a witness; and if Mrs. Barry had been the cause of her leaving, he would have attempted to prove it by her. But whatever may have been the merits or demerits of either in the original

quarrel, when after ten days of mental suffering, the wife went to him and sued for peace, beseeching him with tears to be reconciled to her, nothing can excuse him for repulsing her with taunting language and rudeness. About a week after this attempt at reconciliation, she took advantage of the anniversary of their wedding to appease his anger, and finally succeeded in obtaining his forgiveness for whatever had occurred on her part. Making every allowance for the necessary coloring which a party to such a contest would be likely to give to it, I am irresistibly led to the conclusion that the conduct of the relator toward his wife on that occasion was overbearing and cruel.

Even this was not sufficient to sever the strong chord of affection which still bound her to him ; and in the true spirit of a christian wife she forgave him all. It is evident, however, that these acts of unkindness had created a vague suspicion in her mind that his affection for her had ceased. This very naturally led her afterwards from very slight circumstances to entertain the suspicion that he was unfaithful as well as unkind ; as the only rational way of accounting for his conduct. It is but justice to the relator, however, to say that all the circumstances mentioned in the return do not afford any foundation even for a rational suspicion that he has ever erred in that way. And it is the duty of the wife to banish that idea at once from her mind, if she has not already done so. To this shocking suspicion I attribute the mental anguish which was discovered so frequently by Dr. Reese, the family physician ; and from which he very naturally concluded that her disease was not corporeal but mental. The occasional sallies of passion that occurred, which are spoken of by some of the witnesses, in connection with all that had previously taken place, would not of themselves, I think, have rendered the continuance of life entirely indifferent to her, while her first born child, then but a few months old, stood so much in need of a mother's care. But the distracting thought that one whom she had loved with such deep devotion was wholly worthless and degraded, would indeed be madness ; and might render even life itself a burthen.

The failure of Mr. Barry, and the subsequent closing up of his business in New-York in the winter following, rendered it necessary that he should seek the means of providing for his family by some other employment. And after various attempts to get into business in or about New-York, it was finally arranged between him and his wife, in the spring of 1838, that she and her two infant children should remain with her father, while he with his four elder daughters returned to Nova Scotia for the purpose of seeing what could be done there. Although much had occurred previous to this time to render it extremely doubtful whether Mrs. Barry would ever willingly go back to Liverpool to reside, it is evident from all that occurred at that parting that neither the relator nor his wife then entertained the idea of a final separation. Probably he was not aware at that time of the strong aversion she entertained to a return to Nova Scotia; or of the half formed resolution which then existed in her mind that she would not again leave the immediate neighborhood of her father's residence. This she undoubtedly thought she had a right to insist on, in conformity with their ante-nuptial agreement. That may account for his surprise upon his return to New-York, a few weeks afterwards, in finding she did not very readily enter into his plans of permanently establishing himself in business at Liverpool, and therefore was not willing to use her influence with her father to induce him to lend them his countenance and assistance. Irritated that she did not at once enter fully into his plan for establishing himself in business in Nova Scotia, and that he could not obtain from her a promise to return there to reside at a future day, he left her in anger and removed his baggage to a boarding house, notwithstanding her entreaties that he would remain with her at her father's during his stay in New-York. Two days afterwards she wrote him the letter of the 14th of May, 1838, which is set out in the relator's petition. Considering what had previously occurred between these parties, the fact of the ante-nuptial agreement that their residence, after the first year, should

be near her father's, and the knowledge of her unconquerable attachment to the place of her birth and the home of her parents, I do not see that this letter can properly be considered as evidence of coldness or indifference. She could not, indeed, bring herself to pen a deliberate falsehood, by saying that she wished, or was even willing to go to Nova Scotia to reside, when in fact she was not. Neither would she consent to deceive her parents by telling them she wished to go, to induce her father to enter into her husband's plan of establishing himself there, however flattering his prospects of success might have been under other circumstances.

If the relator had always treated his wife with kindness, I am not prepared to say that it would not have been her duty, notwithstanding the ante-nuptial agreement and her strong filial attachments, to have followed him to any part of the world where he had a reasonable prospect of bettering his condition. But, under all the circumstances of this case, I think he had no right to insist upon her consent to his establishing himself in business at Liverpool, with the view of taking her there to reside, even at a future day. I do not believe that at the time this occurred she either wished or desired a final separation; but she was waiting in the hope that something might occur which would enable them again to unite their fortunes at a future time. And no one who reads the last paragraph of her letter can justly say she was destitute of feeling, though it contains no evidence of that devoted attachment to her husband which existed during the first six months of their residence in Nova Scotia. The husband, however, misled by his feelings, I trust, and not by the unworthy motives attributed to him by the defendant's counsel, understood this letter otherwise. He therefore deliberately penned the fatal answer, renouncing forever the wife who had once loved him so dearly, and declaring his unalterable determination never to be re-united to her on this side of the boundless ocean of eternity; since which time he has had full occasion to feel the full force of that expressive senti-

ment of the rabbi Eleazer, tears shall bedew the altar of him who rashly repudiates the wife of his bosom. [*Quisquis repudiaverit temere uxorem suam primam, etiam altare lachrymos ob eum effundit.*]

Harsh as this proceeding was on his part, I am satisfied from the evidence before me that the affection of his wife for him still continued, although her heart must have been severely tried; especially by the calmly expressed determination of her husband to deprive her of the care and nurture of her first born child, then but nineteen months old. And when he so readily retracted his rash declaration, and gave such evidence of deep contrition for what had occurred, I do not see any thing which could legally justify a final separation between these parties, though I am satisfied it was not then the duty of his wife to go with him to a foreign land to reside. I do not, therefore, consider the subsequent agreement for a permanent separation, at the option of the wife, and providing for the future custody of the children, as necessarily valid and legally binding, so as to give any new rights to either party.

In the language of the late Lord Eldon, the marriage contract, whether it be considered as a civil contract only, or one which is both civil and religious, is a contract of a very peculiar nature. It is one which the parties cannot dissolve; one by which they impose duties upon themselves, and by which they engage to perform duties with respect to their offspring; duties which are imposed as much for the sake of public policy as of private happiness. The circumstance that the complaint against the legality of an instrument, on the grounds of public policy, is made by one who is a party to it, is of no consequence; for the relief in such a case is given in regard to the interests of the public, and not on account of the individual. In *Marshall* v. *Rutton,* (8 *Durn. & East,* 547,) Lord Kenyon emphatically asks, how can it be in the power of any persons by their private agreement to alter the character and condition which by law results from the state of marriage while it subsists, and from thence to infer rights of

action and legal responsibilities as consequences following from such alteration of character and condition? (*See also Prater's Law of Husband and Wife,* 60; *2 Hagg. Consist. Rep.* 318; *2 Hagg. Eccl. Rep. Suppl.* 115.) This is also in accordance with the law of France on the same subject; for the 1388th article of the Napoleon code expressly declares that married persons cannot derogate from the rights resulting from the power of the husband over the person of his wife and of his children, or which belong to the husband as head. The agreement of the 7th of June, 1838, is also void, upon the principle that it is not a contract for a present separation, on the ground of the existence of difficulties between them which render an immediate separation necessary for the peace and happiness of both, or either of them. On the contrary it recites that neither party then wished a final separation; and provides for the relinquishment of his parental rights over his daughter at a future day, if his wife then thinks proper finally to separate herself from him. An agreement having in view a future separation merely, at the election of the wife, was held to be void in the case of the Marquis and Marchioness of Westmeath, in the house of Lords. (1 *Dow & Clark's Parl. Rep.* 519; see also *Hendley* v. *Westmeath,* 6 *Barn. & Cress. Rep.* 200.)

The result of this examination is, that nothing had occurred between these parties, at the time the husband left New-York, in the summer of 1838, which was legally sufficient to authorize a decree of separation from matrimonial cohabitation, according to the laws of this state, or by the laws of the country where the husband is now domiciled; but that sufficient had occurred to justify the wife, both legally and morally, in refusing for the present to place herself under his entire control, in a land of strangers. I concur also in the opinion so strongly expressed by the counsel for the defendant, that the act of tearing her infant son from the arms of a mother, in the vain hope of thereby inducing her to follow him to Nova Scotia, was more likely to produce an irrevocable separation between them than

any thing which had previously occurred. I also believe that all hopes of a reconciliation are at an end, unless he returns that child to her, instead of persisting in his determination of depriving her of the infant daughter also. Much allowance undoubtedly must be made for the excited feelings of a husband and a father, who probably feels that his worldly property has been sacrificed to the wish of his wife to live in New-York, in accordance with the ante-nuptial agreement. He ought however to have recollected that there was great danger of losing his former high standing in society, both as a gentleman and a christian, by an indiscreet attempt to enforce what he believed to be his marital and paternal rights. For, under the circumstances of this case, the natural feelings of one half of the community at least would almost necessarily be against him—and there was but little chance of his finding much sympathy with the other half, whatever they might think of his legal rights ; unless he was able to satisfy them beyond a reasonable doubt that his wife and her parents were wholly in the wrong.

Having arrived at the conclusion that Mrs Barry, at least for the present, is justified in her refusal to accompany her husband to Nova Scotia as her future residence, and that she is not therefore living in a state of separation from him which can be properly considered as illegal and immoral, it remains to be seen what effect that conclusion is to have upon the residence of the child. I have before said this court, upon habeas corpus merely, does not attempt to settle definitely the legal question of guardianship. And the prayer of the petition, on which this writ is sued, is not framed in such a manner as to constitute it an application to the court of chancery, as the representative of the people or sovereign power of the state as *parens patriæ*, having the general care and guardianship of infants, to settle a question of conflicting rights or claims of right. It is also admitted, by the counsel of both parties, that the true interest of the child is alone to be consulted in deciding the question now before me. If the child should be delivered to

its father, I have no apprehension that it would be treated with any unkindness. And I have no doubt that his elder daughters, to whose good characters and amiable dispositions Mrs. Barry herself bears full and ample testimony, would endeavor faithfully to discharge the duties of a mother to their infant sister, as far as they were able to do so ; as they have already done to the brother. But as the infant has no property, its guardianship for the present must be a guardianship for *nurture* merely. And the mother, all other things being equal, is the most proper person to be entrusted with such a charge, in relation to an infant of this tender age. The law of nature has given to her an attachment for her infant offspring which no other relative will be likely to possess in an equal degree. And where no sufficient reasons exist for depriving her of the care and nurture of her child, it would not be a proper exercise of discretion in any court to violate the law of nature in this respect. I am therefore bound to declare in this case, that the infant daughter of the relator is not improperly restrained of her liberty by the defendant, and that no good reason now exists for taking the child from its mother, and from the care and protection of the defendant with whom the mother now voluntarily resides.