Cowen, J.
This is a proceeding by writ of habeas corpus instituted by Mr. Barry for the purpose of enforcing his rights as the father of his infant child, detained by his wife, with the sanction of her father, in the house of the latter.
The relator’s claim, in different aspects, has been examined *406 and decided on several previous writs before different commissioners ; the proceedings on one of which resulted in a writ of certiorari to this court, followed by a writ of error. Costs were awarded against the relator ; and a preliminary objection is, therefore, taken, that he is not entitled to be again heard till those costs are paid. The objection is founded on a supposed analogy to the ordinary cases of repeated and unsuccessful actions for the same cause, where it is generally allowed as a dis* couragement to vexatious litigation.(a) Commissioners under the habeas corpus act, however, have no power to order such stay. They are limited to the course which the legislature have prescribed to them. If the act was intended for the government of our conduct, it follows that our powers aré equally limited. If the statute leaves us to the common law, yet the proceeding is of the same summary character as if before a commissioner 5 and the reason for a stay is no greater in the one case than the other. In both, the object is the same— a speedy inquiry into the cause for which the citizen is detained or imprisoned. From the way to this, the law has been sedulous, as far as possible, to remove obstructions. Admitting, therefore, that we have the power to order a stay, we think it should not be exercised.
Another objection is, that Mr. Mercein should not have been made a party ; the child not being detained by him. The detention is by his daughter, at his house, with his countenance and consent. If that be wrong on her part, it is equally so on his ; for in respect to a civil injury, the law regards every one who participates in and promotes it, as a principal wrong-doer, and severally responsible to the party whose rights have been invaded. It is impossible to avoid seeing that, if‘Mr. Barry is entitled to the custody of his child, Mr. Mercein is, in fact, the principal offender. Had his hand been withdrawn, it is morally certain that the relator would have been put to encounter no *407 serious difficulty in reclaiming the custody of his child without a law-suit.(b)
The objection that the application for this writ was irregular, as not being in the form of a petition signed by the party sought to be relieved or by some person in behalf of the party, in the words of the statute, (2 R. S. 466, 2d ed. § 25,) sup poses that the prisoner or person detained must be privy to the proceeding. This would be impossible in cases where very young children are detained; and so,perhaps, in many others. If authority from the person detained be ordinarily necessary, which we do not admit, clearly there is nothing in the statute taking away the common law right of a parent to bring the writ, when his child is improperly detained. (See In re Pearson,4 Moore’s Rep. 366 ; Wood’s case, 3 Wilson, 172 ; Rex v. Lister, 1 Str. 478.)
The defendant claims that Mrs. Barry "was lawfully at his house; and that, in her right, he is properly accessory to the detention of the child. This brings us to a consideration of the legal rights and powers of the relator and his wife in respect to their offspring. These rights and powers, like nearly all others when the claims of husband and wife come in conflict, depend upon a rule too elementary to require the adduction of authority; and too obvious to have been denied in the whole course of this particular controversy, from the hearing before the chancellor in the summer of 1839, (8 Paige, 47,) through the several hearings before commissioners, in this court, and the court for the correction of errors. The principle is thus stated in 1 Black. Com. 468 : “ The very being or legal existence of the woman is suspended during the marriage, or, at least, is incorporated and consolidated into that of the husband.” Their relative *408 power over the person of the child follows as a consequence, and is stated in the same book, (p. 478, 9,) to the following effect: The legal power of the father over his child is sufficient to keep the latter in order and obedience. The father is entitled to the benefit of his child’s labor while it lives with and is maintained by him ; while the mother, as such, is entitled to no power over it, but only to reverence and respect. The father’s legal power ceases at the age of twenty-one. The extent of the rule is shown by the exceptions which the book mentions atp. 471. They are such as to shield the wife from corporal abuse, though u the courts of law will still permit the husband to restrain the wife of her liberty in case of any gross misbehavior.”
One consequence necessarily resulting from the legal identity of husband and wife, answers Mrs. Barry’s claim to the custody of the child ; which, as counsel have insisted, arises out of the relator’s written agreement that she should retain it That upon a proper construction of its words, she could derive any such right as is now claimed for her, I do not admit. But, for the purposes of the argument, suppose it an agreement for permanent separation—a complete relinquishment by the relator of all claim whatever, and a transfer of his right to Mrs. Barry. A single passage from the law shews its futility. “ A man cannot grant any thing to his wife, or enter into covenant • with her ; for the grant would be to suppose her separate existence ; and to covenant with her would be only to covenant with himself.” (1 Black. Com. 468.) As an agreement, there ■ fore, the writing was void. As a delegation of power, it was revocable in its own nature, and in this instance has been actually revoked. Whatever latitude may have occasionally been allowed for the framing of bargains between husband and wife through trustees, I must be allowed to deny that it stands on any principle which can with propriety be applied to the case in question. I am aware that a separate maintenance may be settled by the husband on the wife, and that,, incidentally, they may covenant for the separation of their persons j. *409 that this may, if you please, be clone under such pretexts as the parties shall choose to allege, whether in consonance or not with the law of divorce ; and that courts both of law and equity have sanctioned such arrangements, by carrying them into effect. The practice probably started on the principle I have mentioned, of protection against corporal abuse, without its being sought with sufficient care to distinguish the fact from the mere declaration of the parties. The courts do not seem to have foreseen that, in doing so much, they empowered the parties to be their own judges in a matter which may, in the end, vitally affect the interests of society. The practice is in itself by no means entitled to favor ; and the courts are beginning to regret that they ever allowed it to any extent. It is at best letting into our system the doctrine of conventional divorce in its worst form. The advocates of that doctrine car - ry out their system to its proportional consequences. They would leave the parties at liberty to marry again ; thus fulfilling the supposed law of nature with comparative decency. Our law still proclaims the obligation of the marriage contract, while it aids the parties in measures to evade that obligation, and thus to defraud both the law and one another. The whole is indeed matter of agreement between persons who are immediately interested ; and the consequences, if confined to them, might be regarded as of little moment. The discouragement to enterprise in business, the wreck of private fortune and loss of character, might be placed to the account of retribution for such wickedness or weakness as cannot endure the trouble of becoming respectable. But the evil does not stop there. An innocent family and a wide circle of connections are perhaps brought to share in the misfortune and disgrace, with more ox-less intensity, as they may be more nearly or remotely related. The sentiments of filial reverence are subverted, and the conjugal relation itself distrusted and traduced. Husbands and wives with feelings and appetites already too violent for the restraints of duty or of shame, are thrown into the highway of temptation. It is said that the husband’s common law right to *410 correct the wife began to be doubted in the politer reign of Charles the Second. (1 Black. Com. 471.) It has since ceased to exist. In asserting the principle on which the barbarous practice of correction was abolished, the courts should beware of the opposite extreme that characterized the same reign. Much as we may congratulate ourselves on the abolition of unreasonable severity, such an achievement would but poorly compensate for the general corruption of domestic morals.
I make these remarks because they come into the argument that the doctrine of separate maintenance cannot be made to bear on the agreement in question ; which, as it seems to me, is neither within the original principle of the rule, nor the sphere of its most extended practice. If the husband has a right to transfer the marriage bed to his wife, I deny that he has, therefore, the right still farther to violate his duty by sell ing his children, with or without it. These he holds under the duty of a personal trust, inalienable even to another who is sui juris ; a fortiori to his wife, with whom he can make no contract whatever.
We do not perceive with counsel, that in Mercein v. The People, (25 Wend. 64,) the court of errors differed from us upon this question. We understand that court, on the contrary, •to have reversed our former decision upon the sole ground that the question before us, being res judicata, we had no right to take notice of the truth. To avoid misapprehension, that court told us so by an express resolution.
I have, therefore, felt entirely warranted in withholding from the agreement that effect which two of the members of the court of errors seemed in the course of their arguments to have thought might possibly be due to it. The doctrine of the cases cited by Senator Paige, I have already conceded in all their force. (Rex v. Lister, 1 Sir. 478 ; Rex v. Mead, 1 Burr 542.) They were both cases of separate maintenance, on which it was held that the husband had lost his power over the person of his wife, -Children were , not in question I *411 have endeavored to show that such cases form an exception in the law of husband and wife; and have suggested some reasons why I think the principle should not be extended in its operation. I know the learning of that senator, and have great deference for his opinion ; but I have in this instance felt less diffidence in my dissent, because I find the learned chancellor had before pronounced the agreement in question void. (The People v. Mercein, 8 Paige, 67, 8.) Admitting that an agreement for present separation is valid as between the parties, (and I have supposed it to be a kind of divorce which the courts cannot very well gainsay at this day,) I am yet unable to see that, as a consequence, the husband may contract away the custody of his children. It need not be denied that a father may, even at common law, bind out his child to an apprenticeship, as this court seem to have thought in The Matter of M'Dowles, (8 John. R. 328.) Here again is a narrow exception, the principle of which should never be extended to any other case-. The exception itself was so very doubtful that a statute was deemed necessary for conferring a right on the parent even to this extent. Those countries in which the father has a general power to dispose of his children, have always been considered barbarous. Our own law never has allowed the exercise of such power except for some specific and temporary purpose^ such as apprenticeship during the father’s life, or guardianship after his death. But was it ever heard that during his lifetime, he could bind out his child to his own wife, even as an apprentice 1 The case of the M’Dowles was of persons competent to contract. The disability of husband and wife was not in question. In the language of Lord Kenyon, applied by Chancellor Walworth to the agreement in question, (8 Paige, 67-,) I ask, “ how can it be in the power of any persons by their private agreement to alter the character and condition which by law results from the state of marriage while it subsists 1” The rights of the relator being clearly unimpaired by the alleged bargain between him and his Wife, the case is, on its merits, brought down to the single point on which it was con *412 siderecl before the chancellor, (8 Paige, 47 ;) viz. whether, assuming that the wife resolves to continue in her state of separation, a due regard to the welfare of the child will warrant an order for its delivery to the relator ; or whether we shall allow her and her father longer to oppose the supposed necessities of nurture to the demands of law. I say, demands of law, because the defendant’s case was presented to the chancellor in its strongest possible aspect; and no doubt was entertained by him of the relator’s right in legal strictness. This was in the summer of 1839, and could not have been long after the child was weaned. The chancellor then said, if delivered to its father, he had no apprehension it would be treated with unkindness ; adding, “ I have no doubt that his elder daughters, to whose good characters and amiable dispositions Mrs. Barry herself bears full and ample testimony, would endeavor faithfully to discharge the duties of a mother to their infant sister, as far as they were able to do so, as they have already done to the brother.” After considerable hesitation, he refused an order in favor of the relator, on the sole ground of the child’s then tender age. The case wras again investigated before Judge Inglis, before this court, the court of errors, and, finally, on a habeas corpus issued in October, 1840, returnable before Mr. Justice Oakley. It is now three years since it was examined by the chancellor, and more than a year and a half since the suit was commenced before Mr. Justice Oakley. The case has at no stage appeared to be any stronger against the relator than it was when before the chancellor; and the inquiry seems to come with scarcely a plausible answ'er—why should his child be longer withheld! It is at present nearly five years old. The father’s claim, if not stronger, is at least more apparent, for it is by no means unimportant that he has a right to train up this chilrl as he has his other daughters, with dispositions to serve him affectionately in the business of his household, should its health become sufficiently stable. This may indeed be essential to the child’s welfare ; and, I am strongly inclined to believe, will be better attended to by the relator, than by the *413 wife. It is equally his right and his duty to see that the child shall also be properly educated in other respects. The general allegation that a daughter may be well in the hands of a mother who chooses to leave her husband, would, if allowed, work an entire subversion of his right. When we are told in Mr. Mercein’s return, that this child is still in such delicate health as to require a mother’s care, the first answer which strikes the mind is the generality and unsatisfactory nature of the allegation—an allegation by which, if allowed, the relator may still be baffled till his child is twenty-one. Let it be taken, however, that evidence of a propensity on his part wilfully to withdraw his child beyond the reach of maternal care, should form a ground for our refusing to interfere in his favor : the attempt to make out such a case on the circumstances before us is a very extraordinary one. We have seen this man for years soliciting the woman to go with the child, and aid him in its nurture. Bating some matrimonial bickering, the state of his affections was not at all impeached before the chancellor ; and there is now nothing left to impugn the sincerity of his attachment both to the mother and child. He has manifested an anxiety which nothing could repress, that they should both come to the home he has prepared and the table he has spread for them ; or, if his wife’s better feelings should revive and she were to follow after him and his child, he would no doubt joyfully receive her at any time, and strive to forget that she had ever left him. The argument has been urged as if there were, in the abstract, such an unfitness in a woman returning to the bed and board of her husband as can not be endured consistently with a proper sense of duty. I have listened in vain for a single lisp, even in argument, that there would be more danger in this woman returning to the relator, than in the return of any wife to any husband in Christendom. From all we can collect, I am inclined to think she would stand in as little danger from his temper as from his morals. That the former has been well balanced and regulated in his intercourse with society at large, it is not necessary either to affirm or *414 deny. Its general amenity in his family was expressly conceded by Chancellor Walworth, after a severe scrutiny. Before us there has been no attempt to impeach it. The chancellor was also of opinion that, as between him and his wife, nothing had occurred which was legally sufficient to authorize a decree of separation ; and the promise of the relator during courtship, that she should continue near her parents, is not now interposed as a reason for her voluntary separation. To every thing else that was attempted in proof before the chancellor, we may well apply the remarks of Sir William Scott, in Evans v. Evans, (1 Hagg. Consist. Ref. 35.) “ Mere turbulence of tem-
per, petulance of manners, infirmity of mind, are not to be numbered among the causes” of voluntary separation. No corporal violence, or menace of corporal violence, has, at any stage of the controversy, that I can see, been pretended ; and looking at some disclosures in the course of it—the pecuniary embarrassment of the relator, the cause of that embarrassment, the manner in which it was met by the wife, and the irritating disputes which ensued concerning the rights and duties of the parties—it is rather a matter of surprise that we have not witnessed much greater displays of ill temper on his side than have as yet been charged. His affections have been unwarrantably trifled with ; and it is by no means the least evidence in his favor, that during the course of a tedious litigation, he has been the more unwavering in his suit, from entertaining the hope that success would be tributary to a restoration of his conjugal rights. That he was habitually unfeeling, or even rude in language towards his wife during the time when they cohabited together, is now scarcely pretended. The utmost that can be imputed are occasional ebullitions of anger and vexation, arising from momentary excitement operating upon a temper naturally hasty, but by no means unrelenting. The children of his first marriage, it is still conceded, are in tel • ligent and amiable, and have uniformly demeaned themselves towards Mrs. Barry with great attention and respect.
I entertain no fears-, therefore, on what has seemed to me *415 the whole stress of the argument upon the merits against the relator—the alternative between Mrs. Barry’s returning to her husband, and abandoning the care of her child. I see nothing to furnish either a legal or moral excuse on her part for hesitating upon such an alternative.
Clearly, however, it should be enough for this part of the argument that the conduct of the relator has been such as to leave her without excuse. If she still continue in a state of separation, the consideration, of a few facts will be sufficient to remove all objection against the child being restored to the husband ; indeed, dispel all fear of its welfare in his hands. That he now commands a comfortable home with adequate means for supporting the child, is no longer denied. He is at the head of an interesting family, mostly I believe daughters, who have been bred under his care in the best manner; some of them from childhood to age. That he is qualified, and eminently so, for the moral and mental-instruction of this child is clear. That in his family the child can and will derive from his daughters and other means, care and attention fully proportioned to its physical wants, we have reason to be confident. Besides, the next oldest child of the marriage with Mrs. Barry has, with her consent and that of her relatives, been left in the exclusive charge of the relator, from an age, I believe, still younger than that of the child whose custody she claims to withhold. The condition of the older child has been open to enquiry ; and yet we hear not a pretence that its custody could have been more properly bestowed. In short, we know that the relator ranks well as a man of intellect and education. We have evidence that, though not affluent, he is yet a man of business and enterprize, in the prime of life and health, of sound morals and estimable character, with a comfortable, in deed, desirable home, and every means and disposition to take proper care of the child whose custody he sues for.
So far, and while on the merits, none of the members of this court have ever felt any serious difficulty. The question of res judicata—for the first time pronounced applicable by the court *416 of errors to an order made against a parent suing for the custody of his child—is certainly one which admits of more dispute. The claim on the side of the defence is, that by the order of the chancellor, or by that and the orders made after-wards—for they are all spread before us in the defendant’s return—the relator is estopped to assert his rights, whatever they may be. Under the decision of the court of errors, this would doubtless be so, were the ease exactly commensurate with what it was at the time when either of the previous orders were made. The only question is whether an estoppel, for instance in virtue of the last order made upon the habeas corpus of 1840, should be expanded and elongated so as to cut off the relator’s right through all future time. I can hardly think the court of errors intended to give it such an effect; and in the absence of authority defining its extent, we are put to consider the question a priori. It appears to me there are several cases in the law precisely analogous in principle • and by which we ought to be governed in considering the present. A rnan sues for a demand not yet due, and sues repeatedly, but has a verdict and judgment against him upon the ground, not that he has no claim, but that it is inchoate. He waits till it becomes due, and sues again •, no one would pretend that his successive defeats, or any of them, should bar his last action. (New England Bank v. Lewis, 8 Pick. 113 ; Catron, J. in Estill v. Taul, 2 Yerg. 467, 470 ; Wilson v. Hamilton, 9 Serg. & Rawle, 424 ; McLaughlin v. Hill, 6 Verm. Rep. 20.) So here, to speak in analogical language, when the relator sued before the chancel lor and afterwards before Mr. Justice Oakley, the debt foi which the suits were brought' had not yet fallen due, though we now hear from no one that it is not honestly due. Again, the decision of a court on motion is received as an estoppel only upon circumstances exactly similar. It may be opened on the question being changed by new materials discovered or afterwards accruing. (Simson v. Hart, 14 John. R. 63 ; Dickenson v. Gilliland, 1 Cowen, 495.) The mode of inquiry is there quite analogous to that on habeas corpus. It proceeds *417 summarily on affidavit. The question also depends much on the exercise of discretion. So, on habeas corpus to obtain the possession of a child. The question is less one of right than of mere custody ; a question which we know turns upon expediency—too often perhaps upon light expediency, shifting as the hues of the chameleon. Still more strikingly analogous is the common law doctrine that a verdict and judgment in ejectment is no bar to another ejectment for the same land. The law went on the ground that the action related, like this habeas corpus, to possession or custody, and every new action supposed a new and distinct demise. This, although a mere fiction, was received as working out a new point in the controversy, and baffling the force of the alleged estoppel. (Runningt. on Ejectm. 12.) A mother deserts her husband, with a child at her breast; and the father’s claim is denied because it wants a wet nurse, which he cannot furnish. With what propriety, or what decent color can it be said, on the reason ceasing, that the point is the same 1 So where the father is a wanderer or his domestic affairs are in confusion, and the child is very young, he may well be required to postpone the exercise of his legal right till the courts see such a permanent change in his condition as shall insure its comfort. On such change occurring, and the claim being renewed, would it not he trifling with the party and the law to tell him that, on an alteration of the very circumstance which controlled the first decision, the point is still the same, and has been adjudged against him ? It is matter of common experience, that an act rightful under some circumstances may be injurious under others. The gravamen often sounds in continuance. A rightful bailee or lessee becomes a wrong-doer by holding over after his term has expired. A thing which is innocent to-day may become a nuisance tomorrow. To say that an acquittal on the point of present innocency shall be advanced pari passu so as to bar an action for the pernicious effect, would render an estoppel the greater nuisance of the two. It is said, indeed, that estoppel by verdict goes a great way; (Incledon v. Burges, 1 Show. 28 ;) but *418 the meaning is, that it shall run so as to affect privies as well as parties. I will not deny that an acquittal or conviction, where a magistrate is put in place of a jury, should have an effect equal to a verdict and judgment. But in neither case can the judgment or order be received as final, except for its proper purpose and object, with reference to the subject matter of the suit, and upon the points there put in issue and directly determined. (1 Phil. Ev. 334, Cowen Hill’s ed.) In an action for wrongfully backing water upon the plaintiff’s mill from a mill dam below, the defendant pleaded a former action for backing the water, in which the jury found for the defendantj and insisted on this as an estoppel. The plea was holden ill. (Shafer v. Stonebraker, 4 Gill & ’John. 345.) The court said of the former action, (id. p. 355,) “ The plea of not guilty, in the first action, put in issue not only every material fact contained in the declaration, but every defence admissible in evidence under such plea of which the defendant should offer testimony. And under the general issue in this form of action, the defendant may give evidence of a release, satisfaction, award, license to raise and stop the dam and back the water, until the time of issuing the writ in the first action ; or any justification or excuse, or whatever will in equity and conscience, according to the existing circumstances, preclude the plaintiff from recovering.” Among this group of circumstances, they declare it impossible to see on which the case turned so as to apply the estoppel; whether on want of seisin in the plaintiff, or right in the defendant, or on the fact that the dam was not raised or stopped, that the water was not stopped or backed, that the plaintiff had released, or been satisfied, or licensed the injury, &c. I will not stop to show the still greater diversity of defence and excuse which may enter into the question before us. Hardly any magistrate has denied the relator’s legal and moral right to the custody of his child ; at least it is impossible to see that such right has ever been questioned by any magistrate whose decision has been returned to us; nor should it be supposed, after seeing that the chancellor put the whole case *419 on the fact that, at the time when he spoke, the mother was excused in not following her husband to Nova Scotia, and that the child not being then two years old, should remain with her for nurture. He did not see fit to extend even this temporary indulgence, except as a consequence of what he thought the relator’s harsh, though not illegal conduct towards his wife-certain instances of unkindness without apparent cause. The moment we depart from legal causes of separation on account of temper, which never arise except from bodily injury either actual or menaced, the points of the controversy are illimitable. They extend to austerity of temper, petulance of manners, rude ness of language, a want of civil attention and accommodation, occasional sallies of passion, indeed through the whole chapter of family jars; matters which, it is generally agreed, the parties should decide as well as they can in their own domestic forum. They are moral offences, in respect to which both parties are often about equally blameable. Happily, they are commonly fleeting and evanescent, a sort of sinning and repenting business, to which an estoppel can hardly be applicable. The very best men and best wives are not always in full command of their tempers. Sometimes where a good man’s prospects in life are discouraging, as Mr. Barry’s appears to have been, he may, for a time, fall into a state of habitual peevishness, annoying and tormenting the very persons who are dearest to him. Such effects, especially between husband and wife, pass away like the summer cloud, unless aggravated by recrimination or desertion. It would surely be a harsh application of the rule of estoppel, to say that because a man stands convicted of being in bad temper, he should, therefore, be permanently deprived of his children. I do not believe that any magistrate has intended to convict Mr. Barry of more, unless indeed it be the crime of living in Nova Scotia; a crime which I am so unfortunate as not to appreciate, and which I am happy to find the counsel for the defendant do not insist upon even as an auxiliary ground of defence. All the points of mere convenience have ceased to be the same as formerly, by *420 his having acquired a settled residence, and means perfectly equal to the comfort and welfare of the child at its present increased age.
The short answer, then, to the alleged estoppel is, that though it be admissible in a case precisely the same with that adjudged, it has no application to one which is in its own nature ambulatory, and which has ceased to be the same by progression The rule is, nemo debet bis vexari fro eadem causa. But be • fore we give it application, we ought to be well assured that the cause is the same. If it be, the claim should be holden extinguished, or suspended, according to its nature. Where the entire right has been once litigated and passed upon, it should not be stirred again. To allow a second trial, would be against ■ public policy, and therefore unjust; but it would be monstrously unjust to cut off substantial rights which have not and never could have been tried, for the reason that they either did not exist, or were disallowed at the moment for some fleeting cause which has ceased to exist; nay, though it have ceased to exist in the same form or degree which influenced the mind of the judge on the first trial.
On the right of the matter now before us, there never has been even an issue. That the relator is the husband and father, was never denied. The only issue was, on the expediency of leaving the child for nurture with a mother who had withdrawn from her husband and bade him defiance. Whether the same morbid excuse for desertion may continue, it is not necessary to enquire; but only whether the wrong should, under new circumstances, be allowed longer to suspend the assertion of right. The claim of the husband has throughout been allowed to be paramount by every body except the wife. It has not been denied that he is the legal head of the whole family, wife and children inclusive ; and I have heard it urged from no quarter that he should be brought under subjection to a household democracy. All will agree, I apprehend, that such a measure would extend the right of suffrage quite too far. Yet I do not see how this defence can be sustained unless we are *421 prepared to go that length. Marriage is indeed regarded by our law as a mere civil contract; but not such an one as is capable of repudiation by a majority of the family, or even the assent of the whole. Bating some slight amelioration, its obligations should be maintained in all their ancient rigor. There is scarcely a doubt that matrimony in the severe form of monogamy, with the prerogatives of the husband as they are announced by the common law, are no less according to the order of nature and providence, than of positive institution.
Where the child is of such tender years as to be incapable of election, it should be delivered to the father on his attending to receive it. That is this case.
Bronson, J.
After these parties were before us on a former occasion, a writ of habeas corpus, returnable before Mr. Justice Oakley, was issued in October, 1840, and the final decision of the judge against the relator was made on the first day of March following. As that order has not been reversed, the relator is estopped from asserting that he was entitled to the custody of the child at the time the writ issued, and it may be that the estoppel extends down to the time of the final decision of the judge. (Mercein v. The People, 25 Wend. 64.) But that case decides nothing in relation to the rights of the parties at the present time.
On the former occasion, the case was before us by way of review. It is now presented as an original proceeding, disembarrassed of all collateral questions, and the only enquiry is, which of these parties has at this time the best title to the custody of the child.
Although we have a volume of papers, the merits of the case lie within a narrow compass. The relator is the father of the child, w’hich is now about four years and a half old. Mrs. Barry, who had before deserted her husband, persists in the purpose of continuing the separation and claims the right to detain the child from the custody of its father. In this she is seconded and maintained by the defendant, with whom she *422 lives, and to whom the writ was directed. There has been no impeachment of the moral character of the relator, nor is there any thing to show a want of capacity on his part for the proper care and training of the child. He is in all respects as well qualified as the mother for the proper discharge of parental duties, and, so far as relates to a just sense of the obligation of marriage vows, he stands most decidedly on the vantage ground. The question then is, which of these parties, the father or the mother, has the best title to the custody of the child I The opinion of this court has been repeatedly expressed, that by the law of the land the claims of the father are superior to those of the mother. The subject was considered and some of the cases were noticed in the opinion delivered by me as the organ of the court in a former stage of this controversy. (25 Wend. 72, 83.) It cannot he necessary to go a second time over the same ground. It is sufficient to say that my opinion remains unchanged.
We have been referred to a late English statute touching this question. But the British parliament has long since ceased to give laws to this country, and our legislature has not yet spolcen. This statute proves, however, that in England even bad laws cannot be altered without the co-operation of both branches of the legislature. I say had laws, for it cannot be denied that there had been one or two decisions of the English courts on this subject which fully justified the remark of Chief Justice Denman in the house of lords, that the judges u felt ashamed of the state of the law, and that it was such as to render it odious in the eyes of the country.” We have been referred to this remark as one having a bearing upon the case under consideration. But as we have never followed, and never intend to follow the decision mentioned by the chief justice, we have no occasion to unite in the confes sion made by his lordship.
It is possible that our laws relating to the rights and duties of husband and wife have not kept pace with the progress of civilization. It may be best that the wife should be declared *423 head of the family, and that she should be at liberty to desert her husband at pleasure and take the children of the marriage with her. But I will not enquire what the law ought to be. That prerogative belongs to others. I will however venture the remark, even at the hazard of being thought out of fashion, that human laws cannot be very far out of the way when they are in accordance with the law of God.
I think an order should be made that the child be delivered to the relator.

 See Taylor v. Vandervoort, (9 Wend. 449.)

 See as to a return of non-detention simply, in such cases, Ex parte M’Clellan, (1 Dowl. Pr. Cas. 81 ;) The King v. Winton, (5 T. R. 89 ;) Matter of Stagy, (10 John. R. 328.)