THE PEOPLE, *ex rel.* ANN AUGUSTA WILCOX, *vs.* MORRIS WILCOX.

In determining the question as to the care and custody of a child, in a contest between the surviving mother and the grand parents respecting such care and custody, the interest of the child should be the governing motive with the court; and whenever that is ascertained, judgment should be pronounced accordingly, irrespective of all other considerations.

Other things being equal, the mother of a female child, whose father is dead, is the most proper person to be intrusted with her nurture, care and custody.

An appointment of a guardian, made by a surrogate, is to be deemed valid until reversed. It cannot be assailed in a collateral way, by proceedings upon *habeas corpus.*

The statute is imperative that upon an application being made to the surrogate, for the appointment of a guardian of an infant, the surrogate shall assign a day for the hearing. But if he determines that notice to the relatives need not be given, he may assign the day on which the application is presented. And where there is nothing to show that this was not done, it will be presumed that the surrogate assigned the day of the application, for the hearing.

The statute confers a discretion upon the surrogate, in respect to requiring notice to be given to the relatives of a minor, residing in the county, of an application for the appointment of a guardian.

While a child is in the custody of its general guardian, duly appointed by the

The People *v.* Wilcox.

surrogate, it cannot be deemed under illegal imprisonment or restraint, merely from the guardian's refusal to deliver such child to its mother.

Upon a statute writ of habeas corpus, the powers of the officer are confined to the determination of the question whether there is an illegal restraint, and if so, to the removal of the restraint. And in the case of an infant, too young to make a choice, the officer must see that the infant is delivered to its legal custodian.

To this extent the writ may be executed by a commissioner at chambers.

A justice of the supreme court, upon a statutory writ of habeas corpus, returnable before him at chambers, possesses no other powers than such as are possessed by a supreme court commissioner, under the statute. He cannot, therefore, exercise that species of jurisdiction which belongs exclusively to a court of equity.

But upon a petition addressed to the supreme court in equity, and presented to a justice of the court at chambers, out of term, such justice has power to entertain the proceedings, and to make an order that the care and custody of an infant child be committed to its mother, and that such child be delivered over by its general guardian to the mother, to remain with her until the further order of the court.

A court of equity possesses a controlling and superintending power over all guardians, whether testamentary or appointed by the surrogate. And it will exercise that power by taking the ward from the guardian, and delivering it to its mother, or some other person, whenever the interest of the ward requires it.

PROCEEDINGS upon *habeas corpus*, instituted by the relator, to obtain the possession and custody of her infant daughter. The facts are set forth in the opinion below.

*H. R. Mygatt,* for the relator.

*J. A. Spencer* and *W. O. Merrill,* for the respondent.

MASON, J. This is a proceeding upon habeas corpus, instituted by the relator, to obtain possession and custody of her infant daughter, Theresa Wilcox, who was eight years of age in December last. The relator was married to Nathan B. Wilcox, a son of the respondent, in February, 1838, and who died in February last, leaving him surviving the relator, his wife, and two infant daughters, Theresa and Charlotte ; Charlotte being two years younger than Theresa. At the time and after the birth of Theresa, the relator was in such feeble health that she was

unable to have the care and charge of Theresa, and she was taken, when but a few weeks old, to the respondent's, where she has remained ever since. Mrs. Wilcox, the wife of the respondent, has had the charge of her, assisted by her daughter. The grand parents and family have become very much attached to her. Nathan B. Wilcox became very intemperate; and in July, 1848, the relator's father, Ira Wilcox, who resided in Oxford, Chenango county, took her from him and she ceased to cohabit or live with her husband from that time, who, it would seem from the evidence, continued to be very intemperate up to his death, and died of *delirium tremens* in February last. At the time the father of the relator took her home, in 1848, Theresa had been with her mother at Utica, her then residence, for a short time, and she was taken by the relator's father to the respondent and left there under an agreement that he should pay $52 a year towards her support, and which sum he has paid every year since that time. It would seem from the evidence in the case, that the father of Theresa never made any legal disposition of the custody or guardianship of this child; and his declarations in regard to his desires as to the future custody of the child are quite inconsistent. If the respondent's witnesses are to be credited—and we find no reason to disbelieve them—he verbally gave this child to his mother, the wife of the respondent, and enjoined upon the respondent and his wife that they should always take care of her and regard her as they would their own child. While on the contrary, the relator produces and proves letters written by him during the years 1852 and 1853, and some of them after it is alleged that he had given Theresa to her grand parents. In these letters he expresses a strong desire that his two daughters should be brought up together and by their mother, and in two of the letters at least, expresses a determination to take Theresa from her grand parents and commit her to her mother, the relator. In these letters to his wife he speaks of the difficulty of severing the ties of attachment which exist on the part of the grand parents towards this child, and says, " *I expect when the time comes for her to go, there will be a fuss.*" It would seem

from this correspondence that the father desired that this child should be brought up by her mother and with her sister; and it is quite difficult to reconcile his letter of February 6th, 1852, with the idea that he preferred to commit the custody of this child to the respondent and his wife rather than to the relator. Ira Wilcox, the father of the relator, a man of fortune, died November 29, 1852, making a very handsome provision in his will for the two children of the relator. They are to receive an annuity of $300 each, until they attain the age of twelve years, when it is to be increased to $600, until they attain the age of twenty-one years, when they are each to receive a very handsome estate. The relator has an annuity under the will of her father of $1500. This annuity to these two children is by will placed in charge of the relator, "*to be expended by her in the nurture, maintenance and education of said children,*" and this child has no other property. It seems from the evidence in the case, that after the father of the relator took her home in 1848, he interdicted all intercourse between the relator and her husband, unless short interviews were had in the presence of the family or of some members of it; and it seems from the evidence that the relator never visited the family of the respondent after she separated from her husband in 1848, until after the death of her husband and on the first of June last, when she went to obtain Theresa. She has seldom seen Theresa since 1848, and then only when she was brought to Oxford by her father on a visit for a few days. She swears, however, that she has always been desirous of obtaining her, and having the custody, nurture and education of her herself; and it appears from the evidence, that in 1851 she made an effort to obtain her, and the consent of her father was obtained, but the grand parents refused to let her go: the father all the while affirming that he was willing she should go if the grand parents were willing, but they refusing she was allowed to remain. The father of Theresa died on the 7th day of February last, while the relator was temporarily absent from the state and in Florida; and on the 10th day of February, but three days after the death of the father, the respondent, in the absence of

the relator from the state, was on petition to the surrogate of Oneida county appointed general guardian of Theresa. This appointment was made on the same day of the application and without notice to any of the relations, although the application shows that there were relations living in the county of Oneida.

It appears from the testimony given before me, upon this investigation, that the relator is a lady of refinement and education, entirely competent to have the nurture and education of her children committed to her; and it appears quite satisfactory, from the evidence, that the child has been uncommonly well cared for in the family of the respondent, and that they are very much attached to the child, and the child very much attached to them; and I entertain no doubt but the wife of the respondent has proved herself a faithful mother to the child, and that she is entirely competent to the proper discharge of all the duties of nurture and training, which the interest of this child may require. And I entertain as little doubt, from the evidence before me, that no detriment can arise to this child from any want of respectability of the family in which she has been thus far reared. The respondent and his family have maintained a respectable standing and position in society, and the long acquiescence of the relator and her father in the residence of this child in the respondent's family implies all this. I do not attach very much importance to the unguarded, and to say the least, highly improper and violent expression of the respondent at the time the relator called with Mr. Mygatt to obtain her child. They were words spoken under a very high state of excitement, and it is but charitable to attribute them to an outburst of uncontrollable feeling. I cannot think the respondent is a man of general profanity, or of ungovernable passions. The relator having resided in his family must have known him well, and if such had been the case I cannot think she would have consented to have the child remain so long in his family; and we should reasonably expect that if such was the case, some general evidence at least of the fact would have been given on this investigation. The case is not one free from embarrassments, as to the duty of the court in regard to the determination which

The People *v.* Wilcox.

should be made as to the custody of the child. I found, on examining the child, that she most decidedly prefers to remain where she is, with her grand parents. She expressed herself very decided in her preference. She appears to be an active sprightly child, in her ninth year, and when I asked her why she preferred to remain with them, rather than go and reside with her mother, she answered that her mother was a stranger, and that she knew grandpa and grandma, and I have no doubt that she would have said she loved them better than her mother. This is no more than we should expect; it is the infant heart speaking its simple language in behalf of those who have nurtured, fed and watched over it from its first impressions and recollections, for a period of almost nine years. It is the hand that has fed, the eye that has watched, and the heart that has showered its smiles and caresses upon the infant for the first nine years of its existence, that may confidently claim its love and affection ; and if left at that period to determine for itself, no one can doubt with whom it would go. At this tender age it scarcely realizes any other mother than the one who fills this place in its childish affections ; and I agree with Justice Patterson in *Re Preston,* (5 *Dowl. & Ryl.* 247,) where he says, "It seems to me but mockery to ask a child of nine years of age, whether it would sooner remain with a person who brought it up or go with a stranger." It seemed to me on the trial altogether useless to question this child, and I stated to the counsel that I would assume that the child would prefer to live with those who had brought her up, and the examination was only made as it was insisted on as a duty devolving on the court. The fact, however, that this child has lived in the respondent's family almost from its birth, I might say, and that she has become very much attached to the grand parents and they to her, is not to be wholly overlooked in determining the question before us. The severing of that connexion will cost both this child and the grand parents some bitter pangs. The interest of the child, however, must be the governing motive with the court, and whenever that is ascertained, the judgment of the court must be pronounced accordingly, irrespective of all other considerations.

As regards the child, I entertain no doubt but if placed with her mother she will soon become attached to both her and her sister; that she will soon learn to love her mother as she has loved her grand parents. And this it is most certainly the duty of the court to promote. By common consent, in accordance with the dictates of nature and humanity, the mother is regarded as the guardian by nature and nurture of young children, and is no doubt generally better calculated than any other person to nurture, train and protect them, both in sickness and in health, in the years of infancy. The wisdom of the common law cannot be doubted, when it declares that upon the death of the father, the mother becomes the guardian by nature and nurture of the infant children. And such is the language of the common law in all countries where the statute law has not broken in. (*Roach* v. *Gowan,* 1 *Ves. R.* 158. *Rex* v. *Waughford,* 1 *Ld. Raym.* 395. 2 *P. Wms.* 116. *McPherson on Infants,* 66, 72. 3 *Atk.* 624. 1 *Black. Com.* 461. *Forsyth's Custody of Infants,* 9, 10, 108. 4 *John. Ch. R.* 80. 2 *Kent's Com.* 148, 149. 1 *Russell,* 21. 6 *Greenl.* 462.) I cannot but attach some importance, in determining the question before us, to the fact that the only property which this infant has for her education and support, is by the will of her maternal grandfather placed in charge of the mother, to be by her expended for the benefit of the child; and it is in my opinion quite important to the welfare and happiness of these two sisters. who hitherto have been strangers to each other, that they should be brought up and educated together. There is some two years difference in their ages, and they should be brought together, that they may learn to love each other and regard each other as sisters, and be taught the important duties of the relation in which they stand to each other, and to their mother. (*Forsyth's Custody of Infants,* 35. 2 *Serg. & Rawle,* 174. *White's Eq. Cas.* 172.) There is another feature of this case which it seems to me is entitled to very considerable consideration in determining the question before us. It is the relation which exists between the relator, and the respondent and his family. It is quite apparent from the evidence before me, that they are

The People *v.* Wilcox.

not of one household; and I can come to no other conclusion, from the evidence before me, than that if this child is to continue to reside in the family of the respondent, she will, in all probability, grow up a comparative stranger to her mother and sister. This is a result which would be deplorable indeed to the interest and happiness of both of these infants, and one which should be avoided if it can be, without bringing still greater prejudice upon this child. For these and other considerations which might be suggested, I have come to the conclusion that the interest of this child would be best promoted by committing its custody to the mother. "She," as has been well expressed by the late chancellor of this state, "all other things being equal, is the most proper person to be intrusted with such a charge. The law of nature has given her an attachment for her infant offspring, which no other relative will be likely to possess in an equal degree; and where no sufficient reason exists for depriving her of the care and nurture of her child, it would not be a proper exercise of discretion in any court to violate the law of nature in this respect." (*The People v. Mercein,* 8 *Paige's R.* 47.) In attaining this conclusion, however, I have not been unmindful of the facts appearing on this application, calculated to detract somewhat from the force of these remarks, as applicable to the present case. The fact that this child has been reared to almost the age of nine years a comparative stranger to her mother, and her mother a comparative stranger to her, with the consequent fact of the affections of the child having been so long bestowed upon the grand parents, is calculated to render somewhat doubtful this application of the rule above stated, in its full force, to the case under consideration. And when we add to this what we should naturally expect to exist in this case, the fact that for almost seven years the relator has bestowed her almost undivided affection upon the younger sister, Charlotte, it is not without some misgivings as to the accuracy of the judgment which removes the child from its present abode. The relator, as mother of these children, will undoubtedly have to surmount many embarrassments and difficulties which do not fall to the lot of mothers generally. If Theresa is placed under

her charge and control she will have to gain the affections of a child literally weaned from her, and whose affections have for so many years been bestowed upon another, and, having by her side at the same time a younger sister, who I doubt not has been accustomed to share alone a mother's affections. This young child must, of course, be taught to know why another has come to share with her a mother's affections and regard, and it will require all of a mother's tenderness and fortitude to meet all the conflicting interests, and rear these children amid the jealousies and difficulties which naturally arise amongst children of the same family after so long a separation. This, however, can all be done. The mother is competent to perform just such a task. These seeming difficulties will all give way before a mother's wise training and counsel; and I doubt not, from the evidence before me, that the relator is abundantly competent to discharge these delicate and highly responsible duties which she is so desirous for the welfare of her children to take upon herself. I shall therefore deem it my duty to commit the possession of this child to the mother, unless it should be found that there are legal difficulties and objections in the way.

This brings me to consider the legal objections raised by the counsel for the respondent. It is claimed and insisted in this behalf, that the respondent is the legally constituted guardian of this child, and as such is entitled to her custody and control. I am entirely satisfied, after a careful examination of the matter, that the appointment of the respondent by the surrogate of Oneida as the general guardian of Theresa is valid until reversed, and that it cannot be assailed in this collateral way, by proceedings upon habeas corpus. (*The King* v. *Hopkins*, 7 *East*, 579. *Ex parte Hopkins*, 3 *P. Wms.* 155. *The King* v. *Deleval*, 3 *Burr.* 1436. 10 *Ves. R.* 66, *note* 4. *The People* v. *Mercein*, 8 *Paige's R.* 47.) There are three objections raised to the legality of this apportionment. The first is, that the surrogate did not assign a day for the hearing, but made the appointment on the same day the petition was presented. The statute seems to be imperative that the surrogate shall assign a day. (2 *R. S.* 157, § 5. 9 *Paige's R.* 206.) The surrogate

The People v. Wilcox.

may assign the day on which the application is presented, if he shall determine that notice to the relatives need not be given. There is nothing in the papers to show that this was not done. We must presume, therefore, that the surrogate assigned the day of the application for the hearing.

The second objection is, that no notice of the application, or of the hearing, was given to the relatives of the minor residing in the county. The answer to this objection is, that the statute confers a discretion upon the surrogate, in this respect. The statute, as originally framed and enacted in the revised statutes, seems to have contemplated that all of the relatives residing in the county should be notified. (2 *R. S.* 151, § 5.) But the act of 1831 has modified the provisions of the revised statutes in this respect, by declaring that notice shall be required to be served on such relatives only of the minor as the surrogate shall direct. (*Laws of* 1847, *p.* 532, § 44. 9 *Paige's R.* 207.) There is nothing in the papers before me to show that this statute was not complied with. The third objection is, that the application to the surrogate was fraudulent in alleging the residence of the relator in Florida, when the petitioner knew she was a resident of this state. We cannot attach much importance to this objection, for there is nothing in the statute which would require notice to be given to the relator, as her residence was in the county of Chenango; and besides, I have not been able to discover the fraud in this respect imputed. The respondent being the lawfully constituted guardian of the infant, and possessing under the statute the same powers of a testamentary guardian, (2 *R. S.* 157, § 9; *Id.* 150, § 1,) it is claimed and insisted, that while this child is in the custody of the respondent, she cannot be deemed under illegal imprisonment or restraint, by his simple refusal to deliver her to the relator. This position, it seems to me, is too clear to require discussion or elucidation. I will not go through with a review of the cases to prove this position. This labor has been most faithfully performed by Judge Duer of the superior court of the city of New York, in the case of *The People* v. *Porter*, (1 *Duer*, 709, 719, 720.) I will content myself by referring to the opinion of Judge Duer

in that case, and to the opinion of Judge Coleridge in the case of *The King* v. *Greenhill*, (4 *Adol. & E.* 642,) where the true rule upon this subject is most lucidly enunciated. In the latter case the learned Justice Coleridge, in speaking upon this subject, says, " a habeas corpus proceeds on the fact of illegal restraint." He adds, " where the writ is obeyed, and the party brought up is capable of using a discretion, the rule is simple and disposes of many cases, namely, that the individual who has been under restraint is declared to be at liberty, and the court will even direct that the party shall be attended home by an officer, to make the order effectual. But where the person is too young to have a choice, we must refer to legal principles to see who is entitled to the custody, because the law presumes that where the legal custody is, no restraint exists." In the case of *The People* v. *Porter*, Judge Duer, after quoting the language of Justice Coleridge, supra, with approval, adds, " an infant of such tender years as to be incapable of rationally expressing its wishes, which is all I can understand by incapable of making a choice, is of necessity under restraint ; and in order to determine whether the restraint is legal, the court must determine to whom the custody belongs, (1 *Duer*, 719, 720 ;) and in order to remove the illegal restraint, the court must see that the infant is delivered to its legal custodian." (*Id.*) To this extent I entertain no doubt the legitimate office of our statute writ of habeas corpus extends, and to this extent it may be executed by a commissioner at chambers. I am saved the necessity of an argument to prove that the extent of the office of our statute writ of habeas corpus is the removal of the illegal restraint of the party brought up by the writ, by the very able and, it seems to me, conclusive opinion of Judge Duer in the case of *The People* v. *Porter*, above referred to, (1 *Duer*, 709,) in which opinion his associates, Chief Justice Oakley and Judges Campbell and Bosworth, concurred. If, therefore, I am to regard the present writ purely as the statute writ, which I am to execute as commissioner under the statute, then it seems to me very clear that my powers are confined within the rule above indicated. If so, I need not add that the relator cannot have the

The People v. Wilcox.

relief sought by this writ upon these proceedings ; for while the infant of nine years of age, who, as we have seen, is incapable of exercising any discretion, is in the custody of its legally constituted guardian, the person to whom the law confides it, it cannot be said to be under illegal restraint ; where the legal custody is, in such a case, there is no restraint.

The counsel for the relator claimed and insisted, upon the argument of this case, that upon this writ and these proceedings, I possessed all the powers of the late court of chancery, and that admitting the legal custody of this child to be with the respondent, a court of equity possesses a controlling and superintending power over all guardians, and will take the infant from the guardian and deliver it to another, whenever the welfare and interest of the infant requires it. The question presented is one of jurisdiction. If I am to be considered as invested with the powers of the court of chancery, in the execution of the proceedings upon this writ, then there is no question of jurisdiction. The power of a court of equity in such a case is not to be questioned. It rests upon undoubted authority, and I will content myself with a reference to a few cases. (*De Manneville* v. *De Manneville*, 10 *Ves*. 5. *Creuse* v. *Hunter*, 2 *Cox's Cas*. 242. *Wellesley* v. *Wellesley*, 2 *Bligh's Par. Rep. N. S.* 124. 1 *Dow & Clark*, 152. 5 *Paige*, 597. 8 *id*. 47. *Forsyth's Custody of Infants*, 704, 705. *White's Eq. Cas*. 500. 2 *Story's Eq. Jur.* § 1341. 2 *Kent's Com*. 227, 3d ed. 2 *John. Ch. R.* 439. 8 *Cowen*, 359.) The jurisdiction is the same over testamentary guardians and guardians appointed by the surrogate, as it is over guardians appointed by the court itself. (2 *John. Ch. R.* 439. 8 *Cowen*, 350. 8 *Paige*, 47. 2 *Kent's Com*. 227, 3d ed. 4 *John. Ch. R.* 80.) Under the exercise of this jurisdiction a court of equity will control the guardian, by taking from him the infant and delivering it to its mother, or other person, whenever the interest of the infant requires it. And were the same facts which have been established in this investigation to appear before me at any stated term of the court, either by petition or in a plenary suit, I should deem it my duty, for the reasons above stated, to order and direct the respondent to de-

liver this child to the relator. I entertain, however, very great doubt as to my right to do so upon these proceedings. My right to do so involves a question of jurisdiction, and after the most careful examination and deliberate reflection I have been able to bestow upon it, I have come to a conclusion adverse to my jurisdiction. I will proceed very briefly to state the reasons which have induced this conclusion: I have shown in a former part of this opinion that this child, while in the custody of the respondent, is under no illegal restraint, and that, confining my authority to the strict and legitimate office of the statute writ of habeas corpus, this infant must be left with the respondent, its legally constituted guardian. In the second place, I take it to be very clear, that as this writ was issued and returnable before me at chambers, I do not possess any of the powers which belong to a court of common law, under a common law writ of habeas corpus; for the common law writ can only be granted upon a motion in court. (*The People* v. *Porter*, 1 *Duer*, 714. 4 *Bac. Ab.* 575, *Bouv. ed., tit. Habeas Corpus,* (*B*) 4. 3 *Black. Com.* 152.) And were I at liberty to treat the present as a common law writ. and in pronouncing my judgment to assume the powers not indeed of chancery but of common law courts, it is exceedingly doubtful whether I would be justified in making the order desired. (1 *Duer*, 715 *to* 728, *and cases there referred to.*) It remains to be considered whether this power is possessed by me, in the execution of this writ, in virtue of the chancery powers conferred upon the supreme court and the justices thereof.

The supreme court, as at present organized in this state, possesses all the powers of the late supreme court and the court of chancery; and by the 76th section of the judiciary act, commonly so called, the justices of the present supreme court possess all the powers and jurisdiction of the former justices of the supreme court, the chancellor, the vice chancellor and circuit judges. (*Laws of* 1849, *p.* 323, § 16.) The argument submitted by the counsel for the relator upon this branch of the case is substantially this: that as a justice of the supreme court I possess all the powers of the late chancellor, and that

The People *v.* Wilcox.

as the court of chancery is always open, and the chancellor could issue the writ out of his court at any time, on an application to him, in virtue of his common law powers, a justice of this court can do the same. I entertain no doubt of the soundness of this argument. I do not doubt that upon a proper petition to me at chambers, invoking the exercise of the equity powers of the supreme court, I might grant the order directing the issuing of the writ out of that court, and making it returnable therein. The late chancellor possessed the power to execute this writ as a commissioner, under the statute. (2 *R. S.* 563, § 25. 8 *Paige,* 47. 25 *Wend.* 95.) The power to execute this writ was also an incident to his court. It is an inherent power in the court of chancery, derived from the common law. (8 *Paige,* 47. 25 *Wend.* 95.) The practice of the late chancellor was to issue the writ out of his court, under the seal of that court, returnable before the chancellor in the court of chancery. (8 *Paige,* 47. 25 *Wend.* 95.) If the chancellor assumed to execute the statute writ of habeas corpus as a commissioner under the statute, his powers were the same as those of a supreme court commissioner. It becomes important to inquire, therefore, whether I am to regard this application and the proceedings upon this writ, as had before me as a justice of the supreme court, or a commissioner under the statute, or as a proceeding in a court of equity. The petition presented to me, and the proof annexed thereto, it seems to me, must settle this question. The petition itself conforms to the strict requirement of the statute. This and the accompanying proofs show that the design of the applicant was not only to lay the foundation for the statute writ, but also to make the proofs required on an application to a commissioner not residing within the county where the infant is detained.

If the application be to one of the officers named in the statute as commissioner, the application must be to an officer residing in the county where the person to be brought up is illegally detained. If, however, there be no such officer within the county, or if he be absent, or for any cause incapable of acting, or if such officer shall have refused to grant such writ,

then the application may be made to some officer having authority, residing in any adjoining county. The statute (2 *R. S.* 564, §§ 25, 26) provides that whenever an application for such a writ shall be made to any officer not residing within the county, proof shall be made of the facts above stated, before the officer shall be allowed to issue the writ. The relator made this proof before me. If the application were to the equity side of the supreme court, no such proof is required. But again, no order was entered with the clerk of the court awarding the writ, as is customary. The writ was issued out of the supreme court, and as was customary when issued out of the court of chancery. (25 *Wend.* 95.) This writ itself is not returnable in the supreme court, nor is it returnable before me in the supreme court, as was the form of the chancellor's writ.

Upon the return of the writ the respondent moved to supersede or quash the writ, for the reason that the special county judge of Oneida was authorized to execute the writ, and that he was not absent from the county, and had not been applied to to issue the writ; and upon this motion it was not even suggested by counsel, nor did the idea for once occur to me, that this was to be deemed a writ issued by the court. It seems to me, therefore, that if a judge at chambers can ever be justified in acting at the same time and in the same proceeding in a double capacity, it is quite clear that I cannot do so on the papers before me, if I felt inclined to do so. I am entirely satisfied that upon this writ I possess no other powers than such as are possessed by a supreme court commissioner under the statute, and that consequently I cannot, without a usurpation of authority, assume or exercise that species of jurisdiction which belongs exclusively to a court of equity. I am aware that some of the common law judges, in speaking of the discretionary power of the court upon habeas corpus in the case of infants, have spoken quite loosely on this subject, but this was in cases of writs issuing out of the court where the common law powers might be exercised; but, what is a little remarkable, in all these cases the exercise of that discretion was declined. I have examined with some care all of the

The People *v.* Wilcox.

cases referred to upon the argument, and many others, and I do not hesitate to declare that no adjudged case can be found in the books where, in the execution of this writ, a judge at chambers has assumed, upon the facts appearing in this case, to grant the relief sought. It only remains for me to say, that as I find that Theresa Wilcox is not "imprisoned, detained, confined or restrained of her liberty in any manner or upon any pretense whatever," and as I have come to the conclusion that I have no jurisdiction to grant that equitable relief in the premises which belongs to a court of equity, all further proceedings upon this writ must be dismissed, without prejudice however to the rights of the relator upon any subsequent application by petition or otherwise.

Upon the determination of the proceedings above mentioned, upon the writ of habeas corpus, on the 22d day of August, 1854, the said Ann Augusta Wilcox presented to Justice Mason her petition, setting forth the proceedings had upon the said writ of habeas corpus and all the depositions taken upon said proceedings, both in behalf of the relator and the respondent, and setting forth her claim to the custody of the said infant, assigning various reasons why the custody of the said infant should be given to her for nurture and training. This petition was addressed to the supreme court in equity, and presented to the said justice at chambers, out of term; who thereupon granted an order that the said Morris Wilcox show cause before him, at his office in Hamilton, on the 31st day of August then inst., why the prayer of the said petition should not be granted and the custody of the said child committed to the petitioner. Upon the day named for that purpose, the parties appeared before the said justice; and the said defendant, by his counsel, made the following objections, and argued the same before the said justice

"*First.* That this motion cannot be heard upon the papers served; because, 1st, the affidavit and papers were not made in this proceeding, but in a former and different proceeding, in which they had been used, and that they belonged to such

former proceedings ; 2d, that they are not applicable to this proceeding.

*Second.* That this is not a motion that can be made and heard at chambers, but that it should be made and heard at and in a regular appointed term of this court, if at all.

*Third.* That this proceeding is for the enforcement of an alleged right, and should be enforced by an action commenced in the usual way under the code of procedure, or by petition at a regular term of this court.

*Fourth.* That the said justice has no jurisdiction to hear and determine the matter in controversy at chambers and grant the order asked for, and that the proceeding cannot be had in the county of Madison, but should be had in the county of Oneida."

The hearing upon the said petition was by consent of parties adjourned to the 20th day of September thereafter, and the question raised as to the jurisdiction of the said justice was reserved, and in the meantime the question of jurisdiction examined ; and on the said 20th of September, before any further proceedings were had on said petition, said justice announced to the parties that he had examined the question of the jurisdiction of a justice of the supreme court to entertain such a petition at chambers, out of term, and had come to the conclusion that such jurisdiction existed in the justices of the supreme court, and that he should entertain the proceedings upon said petition. The respondents did not appear further upon said proceedings. The petitioner proved her case, and the said justice on the said 20th day of September, 1854, made an order that the care and custody of said Theresa Wilcox be committed to her mother, the petitioner, and that she be delivered over by the respondent, her guardian, to her mother, there to remain until the further order of the court. The said petition being filed and the order duly entered, and a copy thereof served on the respondent, he appealed from the whole of the said order to the general term. The case was argued in the general term and the order affirmed, and the respondent appealed to the court of appeals, where the case was argued

and the order was affirmed. The main question argued and discussed, both in the general term of the supreme court and in the court of appeals was, whether a justice of the supreme court has the authority, out of term, to entertain petitions and proceedings in equity; and the determination of this case settles the question that such jurisdiction is possessed, and may be exercised out of term.

[At Chambers, September 20, 1854. *Mason*, Justice.]