# THE

# NEW YORK SUPPLEMENT

## VOLUME 156

(92 Misc. Rep. 509)

### BENSON v. SIEMONS.

(Supreme Court, Special Term, Kings County. December 13, 1915.)

1. GUARDIAN AND WARD ⬤⟹33—SPECIAL TERM—CONTROL OF FUND—PETITION.

   The general guardian of an infant, appointed without bond by the Surrogate's Court of Kings County, as authorized by Code Civ. Proc. § 2650, petitioned the General Term for Kings County to have a fund derived from the settlement of an action for personal injuries to the infant, pending in the Special Term, and settled with the court's approval, and on deposit with a trust company pursuant to the order of the Special Term, turned over for the avowed purpose of enabling him to petition the Surrogate's Court for a withdrawal from the fund to pay medical "and other expenses" of the infant. In denying the petition, *held* that, the fund having been so created, it was the duty of the Special Term to conserve it in the interests of the infant.

   [Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 142–161; Dec. Dig. ⬤⟹33.]

2. INFANTS ⬤⟹33—SUPREME COURT—CHANCERY POWERS.

   The Special Term had full power to direct the disposition of the fund derived as parens patriæ under the chancery powers reposed in the Supreme Court by the Constitution.

   [Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 64–66; Dec. Dig. ⬤⟹33.]

3. INFANTS ⬤⟹33—SUPREME COURT—CHANCERY POWERS—LEGISLATIVE INTERFERENCE.

   The Legislature has no power to alter, abridge, or abrogate the ancient jurisdiction of the Supreme Court over infants and their property as parens patriæ, descending from an early period of English jurisprudence and continued in force after the Revolution by the several Constitutions.

   [Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 64–66; Dec. Dig. ⬤⟹33.]

4. INFANTS ⬤⟹33—SUPREME COURT—JURISDICTION—EXTENT.

   Such jurisdiction is not confined to minors, whose property is being administered under the immediate supervision of the Court of Chancery by chancery guardians, but extends to all classes of guardians.

   [Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 64–66; Dec. Dig. ⬤⟹33.]

5. COURTS ⬤⟹472—CONFLICTING JURISDICTION—SUPREME COURT—SURROGATE'S ACT.

   The chancery jurisdiction of the Supreme Court over infants and their property as parens patriæ is not limited or abridged by the new Surrogate's Act (Laws 1914, c. 443).

   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 442, 451, 459, 465, 619, 1199–1202, 1204–1224, 1247–1259; Dec. Dig. ⬤⟹472.]

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. INFANTS &mdash;33—SPECIAL TERM—FUND—DISPOSITION.

 The disposition of the fund derived from the settlement of an action for personal injuries to an infant, made with the approval of the Special Term for Kings County, where the cause was pending, is in the discretion of that court.

 [Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 64–66; Dec. Dig. &mdash;33.]

Action by William Benson, an infant, by Frank Benson, his guardian ad litem, against Charles J. Siemons. On application for payment of the money derived from a settlement of the case to the general guardian. Application denied.

Sparks & Fuller, of Brooklyn, for petitioner.

BENEDICT, J. [1] A general guardian appointed by the Surrogate's Court of Kings County without bond under section 2650 of the Code of Civil Procedure, as contained in the new Surrogate's Law of 1914, presents a petition, verified in March, 1915, asking that there be turned over to him and another person, who is a clerk in the surrogate's office, a fund now in this court and on deposit with a trust company pursuant to an order of this court. He offers a bond in the sum of $500, the exact amount of the fund, instead of twice that amount (see rule 54 General Rules of Practice), which is not acknowledged by the surety, does not correctly name the obligee, the infant, and is otherwise defective.

Aside, however, from the technical defects of the application, I think the fund should remain under the control of this court, especially since the avowed purpose of the application is to work a transfer of the fund under the surrogate's order to the Germania Savings Bank, so as to enable the petitioner to apply to the Surrogate's Court for the withdrawal of part of the fund to pay for medical attendance and "other expenses" of the infant. Irrespective of whether the need for medical attendance may not have passed in the interval of nine months which have elapsed since the petition was verified, it may be proper to call attention to the duty of the father of the infant (and I assume that petitioner is his father) to provide the same, as well as food, clothing, shelter, and other necessaries. The infant's property should not be dissipated to such purposes, except in cases where the parents are clearly unable to supply urgently needed requirements.

[2] The fund having been acquired by the settlement, under the approval of this court, of an action in this court for damages resulting from injuries to the infant, this court is under a duty to the infant to see that it is conserved, or, if necessary, applied, under its direction, for his benefit. That duty should not be shifted to another court, however well qualified to perform it such court may be. This court has, in my opinion, ample power to direct what disposition shall be made of the fund. Haug v. Hewitt, 87 Misc. Rep. 67, 150 N. Y. Supp. 236, and cases there cited. That the provision of the Surrogate's Practice Act of 1914, relative to the appointment of guardians in certain cases without bond (Code Civ. Proc. § 2650), which I criticized in the case last above cited, has not met with the full approval of the surrogates of

this state, is shown by the opinion of Mr. Surrogate Fowler in the Matter of Hirshfield, 88 Misc. Rep. 399, 151 N. Y. Supp. 846, where he comments thereon as follows:

"I perceive how detrimental a construction of the new law dispensing with security by guardians may prove, not only to the infants concerned, which is our first consideration, but to the taxpayers of this county, on whom the expense of any adequate execution of the law must ultimately devolve. * * * I am familiar with the history of this new act, and I think I comprehend its scope and purpose. I may note, incidentally, that the new section, if construed without reference to the context of the Code, is likely to impose on me obligations and duties far in excess of the ordinary obligations or duties of this onerous office, and of a kind I do not feel willing to assume unless imperatively necessary. The new law is also defective, in that it is so framed as to embrace and yet leave out of apparent consideration conduct of such guardians of great moment to infants concerned. But what I most fear is that construction of the new law which will jeopardize the estate coming to infants protected, or rather not protected, by these bondless guardians. The sort of quasi public proctor evidently contemplated by the act as a substitute for security, unless a salaried and bonded official, would be no protection to an infant whose guardian was not under any legal obligation, reinforced by adequate sureties. Up to this moment the office which I characterize as a sort of quasi public proctor, or, in other words, the 'person to be designated jointly with the guardian,' has not been created, and, in my opinion, is not likely to be created in this county so long as I remain in this place. In my judgment such an office would be neither in the interest of the infant nor of the public. Yet without such an office the section seems to me to be practically unworkable. * * * I am not surprised to find, therefore, that the Supreme Court of this state has in effect disapproved of that construction of the new law which avoids the giving of security by the guardian and has refused to recognize it as in any way binding on that court. Haug v. Hewitt, 87 Misc. Rep. 67 [150 N. Y. Supp. 236]. This is not strange, if we remember that sections 474 and 475 of the Code of Civil Procedure, requiring security of guardians ad litem, have been the generally received statutory measure of guardian's obligations, as I have already intimated in Estate of Seiffert in November last (Surr. Recs. 1914, p. 1135)."

Another feature of the law disapproved by the same learned Surrogate in another case (Matter of Littmann, 88 Misc. Rep. 403, 150 N. Y. Supp. 607) is the provision of the new section 2653 of the Civil Code, as enacted in 1914, whereby the Legislature seems to have attempted to render guardians appointed by the Supreme Court subject to the jurisdiction of the Surrogate's Court. Of this provision he says:

"This type of legislation is revolutionary in this state, in so far as it purports to invest this court with a superintending jurisdiction over the Supreme Court of the state. I do not comprehend it. The Supreme Court is a constitutional court possessed since 1846 of the general jurisdiction in equity exercised by the Court of Chancery of New York for 150 years. One branch of this jurisdiction extends to the custody and care of infants and their property and estates. Such jurisdiction is ancient, well established, and perfectly protected by the Constitution of the state. Wilcox v. Wilcox, 14 N. Y. 575, 577; Matter of Hubbard, 82 N. Y. 90, 92. The Legislature has no power to deprive the Supreme Court of such jurisdiction, or to impede or impair it in any way. Alexander v. Bennett, 60 N. Y. 204. Besides this, the Surrogate's Court has no adequate authority or power to call a guardian appointed by the Supreme Court to account, or to discipline such guardian in any way obnoxious to the Supreme Court. If I were a judge of the Supreme Court, I should not hesitate to issue an inhibition to any surrogate who interfered with a chancery guardian appointed by me pursuant to my constitutional jurisdic-

tion. The new section (Code Civ. Proc. § 2653) in question attempts also to subject the guardians appointed by the Supreme Court to all the duties and liabilities of guardians appointed in the Surrogate's Court. This is evidently done for the purpose of compelling them to account to this court."

It may not be amiss, at this time, to trace the history and development of the jurisdiction of the Supreme Court in respect of the persons and property of infants, and to examine the power of the Legislature to alter, abridge, or derogate from such power.

By the common law of England, in the case of infancy, guardianships of different kinds existed and were in use under that system of jurisprudence, and to these the care of the infant's person and management of his estate were intrusted. But the jurisdiction exercised by the English courts and by the ecclesiastical courts under the common law and by the statutes of England was found not to be broad enough to cover all cases; and there arose the necessity for interference by some other tribunal, which should exercise a continuous supervision over the maintenance and education of the minor, as well as over the conduct of the guardian. For these purposes there was considered to exist in England a prerogative in the crown, as parens patriæ, to be exercised by the Court of Chancery for the protection of any infant residing temporarily or permanently within its jurisdiction. This jurisdiction came to the colony of New York with the English settlement and its establishment as a proprietary colony, and continued in force when the colony became, upon the accession of the Duke of York to the English throne, a crown province; and it was recognized in the Court of Chancery until the establishment of a state government in 1777.

A Court of Chancery for the province was created by the General Assembly of 1683, the first representative legislative body that met after the establishment of the English rule, under an act entitled "An act to settle courts of justice." The provision read as follows:

"Bee It further Enacted by the authority aforesaid, That there shall bee a Court of Chancery within this province which said Court shall have power to heare and determine all matters of equity and shall bee esteemed and accounted the supreame court of this province And be it further enacted That the Governour and Councell bee the said Court of Chancery, and hold and keep the said court: And that the Governour may Depute or nominate in his stead a Chancellour, and be assisted with such other persons, as shall by him bee thought fitt and Convenient." Dongan Laws, fol. 19.

This extract is taken from a certified copy of the original copy of the Dongan Laws on file in the secretary of state's office, rather than from the reprinted Colonial Laws, on account of the inaccuracies contained in the latter copy.

The first Court of Chancery was held on the 16th of February, 1693, immediately after the passage of the act last mentioned. See page ilvi of the learned and exhaustive introduction written by Judge Charles P. Daly which is found in 1 E. D. Smith's Reports. Judge Hoffman held that this act was a perpetual act, and the basis of the jurisdiction of the Court of Chancery, recognized by the state Constitution of 1777. 1 Hoffman's Chancery Practice, pp. 6–19.

But this question, interesting though it may be, is of little importance at the present time, in view of the creation in 1691, after the so-called "Glorious Revolution," of a Court of Chancery possessing similar powers, under the act entitled "An Act for the establishing Courts of Judicature for the Ease and benefitt of each respective Citty Town and County within this Province," passed May 6, 1691. See Bradford's Laws (1st Ed.) 1694, pages 2 and 5.

Under the first Constitution of the state, adopted April 20, 1777, the Court of Chancery was recognized as an established part of the government, as was also the Supreme Court, although neither court was by that instrument created or instituted anew. See articles 3, 24, 25, 27, 31 and 32 of the first Constitution, printed by Samuel Loudon, Fish-Kill, 1777. As is well known, this Constitution was the work of delegates selected for the purpose of adopting a frame of government for the state, and its work was not expressly ratified by the people; but it continued in force, nevertheless, for about 46 years, or until the taking effect, after its adoption, of the second Constitution, prepared by the constitutional convention of 1821.

It is of interest to note that the ordinance adopted by the convention of 1777, setting the new government in motion, contained this provision:

"That all proceedings in the Court of Chancery, and all proceedings in the Supreme Court, which heretofore, while this state, as the colony of New York, was subject to the crown of Great Britain, were by law supposed to be before the king himself, shall in future be before the people of this state."

See Ordinance printed by Loudon, Fish-Kill, 1777, thus declaring that the judicial power of these courts was thenceforth to be derived from and exercised as the act of the sovereign people of the state, and not as proceeding from either of the other two co-ordinate branches of the government of the state, then also established for the use and benefit of the people.

The Constitution of 1821 recognized the existence of the Court of Chancery and the Supreme Court, and both continued under that Constitution to exercise their ancient jurisdiction, though the composition of the courts was altered.

The Constitution of 1846, in article 6, created another alteration in the constitution of these courts by consolidating them in the Supreme Court, upon which was conferred general jurisdiction at law and equity; but this change of composition of the tribunal worked no change in the ancient jurisdiction which the courts so consolidated had theretofore exercised.

The judiciary article of the Constitution of 1867, being the only part of the Constitution to receive popular support at the general election of 1869, continued "the existing Supreme Court, with general jurisdiction in law and equity." Article 6, section 6.

Practically the same provision was contained in the Constitution of 1894. The Supreme Court, as at present constituted, has, in respect of its general jurisdiction in law and equity, succeeded to the rightful jurisdiction formerly exercised by the Court of Chancery and the Supreme Court of the colony and state of New York.

[3] Such jurisdiction exercised for so long a period, and preserved and continued by the people of this state in their several Constitutions without interruption, can neither be altered, abridged, or abrogated by the Legislature; nor can it be renounced or relinquished by the judges of the court themselves. It flows directly from the people, and is intrusted to the court for the benefit of the people. It does not proceed from legislative grant, nor can it be limited or confined either by the Legislature or by any power conferred by it upon the court itself. People ex rel. Mayer v. Nichols, 79 N. Y. 582.

[4] The general theory upon which chancery assumes jurisdiction over the persons and estates of minors is that, by proper proceedings, the infant has been constituted a ward of the court; but as Mr. Bispham observes (Principles of Equity, § 544):

"The existence of property as a prerequisite to an exercise of the jurisdiction of the court would seem to be more of a legal fiction than a reality."

In fact, the rule of jurisdiction of the court is not in this state, nor was it in the colony, confined to minors whose property is being administered under the immediate supervision of the Court of Chancery by chancery guardians, but it extends to all classes of guardians, whether natural, in socage, or statutory, which last includes testamentary and probate guardians. See Ex parte Crumb, 2 Johns. Ch. 439, where Chancellor Kent said:

"There is no doubt of a competent power in this court to discharge or change a guardian appointed by the Surrogate. It is done in England, whether the guardian be one of common law, or appointed by last will and testament; but, in the latter case, the court has required very special reasons for its interference."

In Matter of Andrews, 1 Johns. Ch. 99, he said:

"It has repeatedly been declared that a testamentary or statute guardian is as much under the superintendence of the Court of Chancery as the guardian in socage. Beaufort v. Berty, 1 P. Wms. 704; Eyre v. Countess of Shaftsbury, 2 P. Wms. 107; Rouch v. Carvar, 1 Ves. 160."

This case was followed by Chancellor Walworth in Matter of Dyer, 5 Paige, 534, where he held that the surrogate had no jurisdiction or authority to appoint a new guardian in the place of the one appointed by the Court of Chancery. And the appointment of such new guardian, and the taking of the account of the old guardian, by the surrogate, were both unauthorized and void. See, also, Disbrow v. Henshaw, 8 Cow. 349; People v. Wilcox, 22 Barb. 178, 189; Matter of Waite, per Hatch, J., 40 App. Div. 165, 168, 57 N. Y. Supp. 862, affirmed 160 N. Y. 685, 55 N. E. 1101; Matter of Camp, 126 N. Y. 377, 391, 27 N. E. 799.

It was said by Judge Andrews in Matter of Hubbard, 82 N. Y. 90:

"The jurisdiction of the Court of Chancery over the persons and property of infants, and to appoint guardians of their persons and estates, whatever may have been its origin, is universally conceded, and is one of the most useful and important functions which it is called upon to exercise. * * * The power formerly possessed in this state by the Chancellor is now vested in the Supreme Court, which exercises, through its judges, the same jurisdiction over infants in awarding the custody and care of their persons and property as was possessed and exercised by that officer. Wilcox v. Wilcox, 14 N. Y. 575."

See, also, opinion by Woodward, J., in Strubbe v. Kings County Trust Co., 60 App. Div. 548, 69 N. Y. Supp. 1092, affirmed in 159 N. Y. 603, 62 N. E. 1100.

[5] This power has not in any wise been limited or abridged by the New Surrogates' Law of 1914, nor, indeed, as I have attempted to show, can it be limited or abridged by any act which the Legislature may think proper to pass. In this connection it is interesting and instructive to read an able opinion recently pronounced by Surrogate Fowler, an opinion which clearly indicates the rightful constitutional limitations of the powers of the Surrogates' Courts, and which sheds much light upon the matters herein discussed. Matter of Kent, 92 Misc. Rep. 113, 155 N. Y. Supp. 383.

[6] In conclusion, it rests in the sound discretion of this court to determine the disposition of the fund, and in the exercise of such discretion I determine that the fund should remain on deposit as at present. See Rule 54, General Rules of Practice. If the infant be in actual need of anything which the parent is unable to supply, the petitioner, as guardian ad litem in this action, may apply to this court for leave to withdraw such portion of the fund as the court may deem to be necessary in the premises, to be applied under the direction of this court.

Application denied.